FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CARLOS J. AVENA,<br>*Petitioner-Appellant*,<br><br>v.<br><br>KEVIN CHAPPELL, Warden,<br>*Respondent-Appellee.* | No. 14-99004<br><br>D.C. No.<br>2:96-cv-08034-GHK<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
George H. King, District Judge, Presiding

Argued and Submitted October 17, 2018
Submission Vacated November 5, 2018
Resubmitted August 8, 2019
San Francisco, California

Filed August 8, 2019

Before: Sidney R. Thomas, Chief Judge, and Susan P.
Graber and Milan D. Smith, Jr., Circuit Judges.

Opinion by Chief Judge Thomas

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel reversed the district court's judgment denying habeas relief on a certified claim of ineffective assistance of counsel at the penalty phase, in a case in which Carlos Avena was convicted and sentenced to death by a California jury on two counts of first-degree murder for killings he committed during a carjacking.

Because the California Supreme Court did not address whether Avena's counsel performed deficiently at the penalty phase, the panel reviewed counsel's performance *de novo*. The panel held that Avena's counsel rendered deficient performance by failing adequately to investigate Avena's good character and social history, and had no reasoned or tactical excuse for doing so. The panel held that Avena's counsel also rendered deficient performance by not investigating Avena's claim of self-defense in a jail homicide to counter the State's use of it as aggravation evidence, and had no reasonable or tactical excuse for not doing so.

Because the California Supreme Court concluded that Avena was not prejudiced by his counsel's performance, the panel reviewed the California Supreme Court's decision regarding prejudice under AEDPA's deferential standard. The panel held that the California Supreme Court's conclusion that Avena failed to show prejudice was objectively unreasonable because the complete lack of

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

mitigation evidence during the penalty phase all but ensured Avena's fate, as the jury was given no reason to consider whether he deserved anything less than death. The panel wrote that it does not suggest that a state court's conclusion of no prejudice is always unreasonable when defense counsel does not present any mitigation evidence, but that the mitigation evidence here was humanizing, painting Avena's crimes in a different light and providing an explanation for the jail homicide. When weighing the totality of this mitigation evidence against the aggravation evidence, the panel concluded there remains a reasonable probability that at least one juror would have determined the circumstances did not warrant death, and that in the unusual circumstances of this case, no fairminded jurist could disagree.

The panel remanded for the district court to grant the writ unless the state court resentences Avena within a reasonable time to be determined by the district court.

**COUNSEL**

Sean K. Kennedy (argued), Los Angeles, California; Michael J. Lightfoot, Of Counsel; Mark R. Krozdowski, Deputy Federal Public Defender; Hilary Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

Michael Katz (argued) and A. Scott Hayward, Deputy Attorneys General; Lance E. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

**OPINION**

THOMAS, Chief Judge:

Carlos Avena was convicted and sentenced to death by a California jury on two counts of first-degree murder for killings he committed during a carjacking in 1980. The district court denied his habeas corpus petition raising claims of ineffective assistance of counsel at the guilt and penalty phases of his trial, but the court granted a certificate of appealability on the penalty-phase claim. We have jurisdiction under 28 U.S.C. § 1291 and 28 U.S.C. § 2253.

Because the California Supreme Court unreasonably applied clearly established federal law in denying Avena's claim for ineffective assistance of counsel at the penalty phase, we reverse the judgment of the district court.

I

A

Avena was convicted of two counts of first-degree murder and sentenced to the death penalty. The facts of his crimes are detailed in the California Supreme Court's opinion denying him habeas relief. *See In re Avena*, 909 P.2d 1017, 1022–23 (Cal. 1996).

In September 1980, Avena and brothers Victor and Arturo Padua were driving on the streets of Los Angeles, California, after drinking beer earlier that night. Avena sat in the backseat with a .22-caliber rifle. When stopped at an intersection, a car pulled up next to theirs and occupants in each car exchanged insults. One person in the other car threw

a beer bottle, hitting the car door closest to Avena. Avena shot at the other car a few times in retaliation. As the car drove away, Avena and the Padua brothers followed it and eventually crashed their car into the rear end of the other car, leaving their own car inoperable.

After the crash, Avena and the Padua brothers approached a nearby Chevrolet Camaro occupied by Manual Solis and Miquel Vasquez. They demanded that the driver hand over his money and the car keys. Arturo Padua struck the driver with a piece of wood. Avena shot the passenger and then shot the driver. Both men died from their injuries.

Now driving the Camaro, Avena and the Padua brothers went to Avena's house to get more ammunition. Afterward, they drove to an empty parking lot and set the Camaro on fire. The three men, now on foot, made their way to a nearby intersection, which was next to a freeway off-ramp. After some time, a woman pulled up to the stop light at the intersection in her car. Avena and Arturo Padua approached the car and attempted to open the doors. Avena shot at the car, but the woman escaped by driving through the red light.

Two police officers in an unmarked police car were driving on the freeway off-ramp when they saw the car drive through the red light and saw Avena standing nearby with his rifle. Avena shot at the officers, and they fired back in response. Avena and Arturo Padua then fled on foot. Victor Padua hid in the bushes and was discovered by police later that evening. After first providing a false story to the police, Victor eventually revealed his connection to Avena and Arturo Padua. On September 15, 1980, Avena was arrested and charged with the carjacking homicides.

## B

Avena's trial began in November 1981. The evidence implicating him was overwhelming. Victor Padua testified against him. The police introduced a secretly recorded interrogation tape of Avena that largely tracked Victor's account. A law enforcement expert further confirmed Avena's involvement that night when he testified about the type of firearm used in the shooting and the shell casings recovered at the scene.

Avena's trial counsel, Marvin Part, hardly mounted a defense. Part waived Avena's right to appear in civilian clothes during the trial and his own right to make an opening statement. He presented no defense evidence, called no defense witnesses, and eventually conceded Avena's guilt. During his closing argument, Part remarked, "[t]he tape is right in front of you, literally confessing to shooting down a couple of people . . . cold-blooded on the streets in Los Angeles County." After deliberating for a day and a half, the jury convicted Avena of nearly all charges against him—two counts of first-degree murder, two counts of assault with a deadly weapon, one count of intent to commit murder, one count of robbery, and one count of attempted robbery.

## C

At the penalty phase of Avena's trial, the prosecution argued vociferously that Avena deserved the death penalty. They characterized him as a "deadly killing machine" that had "no conscience." They likened him to an animal—Avena could not "live outside the cage" with the general public but "liv[ing] inside the cage amongst the other tigers" also would not stop him from killing again. Indeed, in the prosecution's

view, Avena was worse than an animal, which may "only kill[] when [it] has to," because Avena "doesn't kill to live, he kills for things like a ride home to get bullets."

To support this characterization of Avena, the prosecution introduced aggravating evidence of other violent crimes in which Avena was implicated. A former member of a rival gang testified that in January 1978, he was standing on a street corner with three friends when a man jumped out of a car and fired two shots at them from a shotgun. A detective, who investigated the shooting for the Los Angeles Police Department, then testified that he arrested Avena in connection with the incident, explaining that Avena admitted to the shooting.

Two deputies testified that, while Avena was in jail awaiting trial for the carjacking homicides, he was implicated in the homicide of another inmate. One deputy testified that he saw Avena stab the inmate three or four times while the victim was lying on the floor. The other deputy, who later apprehended Avena, testified that Avena was "wearing a towel wrapped around his midsection, a known protective tactic used by jail inmates who anticipate participating in a knife fight." *Id.* at 1040–41. The inmate eventually died as a result of his injuries.

Finally, a third deputy testified that Avena had once assaulted him while he was processing inmates who had just returned from a medical visit. According to his testimony, Avena "took a swing" at the deputy's face with "clenched hands" and a physical altercation ensued. During the struggle, Avena attempted to bite him before the deputy detained him.

Over and over, with this strong aggravating evidence and passionate argument, the prosecution painted a picture of Avena as something less than a "human being"—a "killing machine" with a "malignant heart, if he has a heart at all," a wild animal that could not be caged, and a "cancer" that must be "remove[d] [] before it kills you."

Avena's trial counsel left this portrayal of Avena entirely unchecked and unrebutted. Part presented *no* mitigation evidence and called *no* witnesses to testify on Avena's behalf. He presented nothing about Avena's childhood, good character, social history, or extensive drug use. He called only two witnesses to testify about the homicide in the jail, neither of whom was present during the incident.[1]

Instead, Part commended the jury on returning the "correct verdict." Part explained that he "couldn't bring [him]self to the level to tell [the jurors] that the defendant didn't kill those people that night." There was "no question he did it." And "[t]here [wa]s no way in the world" the jurors could like Avena or have sympathy for him. Avena was "a bad person. There's no question about that."

Part's only argument that Avena should be spared from the death penalty was that, "in [his] opinion," Avena's crimes were not "so heinous, . . . so terrible, . . . so bad, that the public vengeance cries out for" the death penalty. In Part's

---

[1] One witness, a jail deputy, testified that Avena had approached him a few days before the homicide with "several puncture-type wounds on his left temple, neck, and chest" and had said that "an unidentified 'black guy' had tried to get him." Another deputy testified that he had handcuffed another inmate also allegedly involved in the homicide and found a shank lying on the floor near the victim.

view, only serial killers should get the death penalty. Someone like Avena, who has a "violent nature," but whose crimes had no "professionalism" or "sophistication," should not. He concluded by noting that when "people are young they do rash things," and he urged the jury to "put this man away for the rest of his natural life."

Part's performance led the prosecutor to comment numerous times throughout sentencing that there was "absolutely no mitigation evidence," closing out the State's case against Avena by saying, "all of the evidence, all of the inferences, all of the facts in this case are aggravating circumstance . . . [e]very bit of it. There is no mitigation whatsoever." On December 17, 1981, after deliberating for two days, the jury sentenced Avena to death.

## D

Avena filed his first state habeas petition in 1986. Relevant to his claim of ineffective assistance at the penalty phase, Avena alleged that Part was constitutionally ineffective for failing to conduct an adequate investigation, interview witnesses, present mitigating evidence, and argue effectively. *Id.* at 1023. In support of his claim, Avena attached several declarations.

In his own declaration, Avena stated that he smoked "sherms"—which are cigarettes dipped in PCP—on a regular basis for six months to a year before the night of the carjacking homicides and that he smoked one in the car with the Padua brothers that day. Avena further testified that he had informed Part about smoking PCP on the day of the crimes and had requested to see a "shrink." He also gave Part the names of people in jail who had witnessed the homicide

of the inmate and would testify that Avena acted in self-defense.  Avena testified that Part said he "did not have anything to do with that and was not getting paid to investigate it."

Avena also submitted declarations from two lawyers representing him in other cases regarding interactions they had with Part.  Eleanor Kraft, Avena's counsel handling his direct appeal and state habeas proceeding, met with Part in November 1982.  Part told her that he had Avena wear jail attire throughout the trial because "[y]ou know how those Blacks and Mexicans are—they don't know how to dress right.  They dress too loud and with the wrong colors and that would make things worse."  Part also explained to Kraft that he did not call any family members during the penalty phase because "he did not think they would help," and he did not call Avena's girlfriend because "she was 'dumb' and had a 'bad record.'"

Finally, Part also stated that he did not have a file for Avena's carjacking homicide case because he provided it to the lawyer representing Avena in the homicide of the jail inmate.  But Roger Potash, Avena's counsel for this jail homicide, stated that he did not receive a case file from Part.  Potash also testified that he had interviewed witnesses to the jail homicide who supported Avena's contention that he acted in self-defense.

Various family members and friends also submitted declarations.  Avena's mother discussed a so-called "chair incident," which Part gave as the only reason why he did not present any mitigation evidence during the penalty phase of Avena's trial.  Avena's mother explained that Avena once threw a chair at his father, but that he did so to protect his

mother, whom his father was in the midst of physically abusing. She and Avena's sister also described Avena as a loving son and brother. They both knew that Avena used PCP in the time preceding the carjacking homicides. Avena's mother, sister, and girlfriend all stated that they were never contacted to testify at Avena's trial. Finally, Arturo Padua stated that he regularly smoked PCP with Avena and, on the evening of the carjacking homicides, he said that he, Avena, and Victor Padua smoked "sherms."

Two expert witnesses submitted declarations regarding the symptoms and effects of PCP use. Philip Berger, a psychiatrist, stated that "the negative aspects of PCP intoxication syndrome are reported to include disorientation, mental confusion, anxiety, irritability, paranoia, and violent, aggressive or assaultive behavior." After reviewing various case materials related to the carjacking homicides, Berger concluded that "Avena's behavior and mental state," as Avena described it, were "consistent with PCP intoxication." Edward Sanchez, a private investigator to Avena's habeas counsel and a former police officer, stated that the potency and effects of PCP can be "unpredictable." Long-term PCP users "may also suffer a flash back and exhibit all the symptoms of being under the influence, even if the person has not used for a period of time."

Sanchez also submitted a declaration explaining what he learned from William Stenberg, Part's investigator, whom he interviewed about Part's representation of Avena. Stenberg said he had interviewed Avena and four other persons *after* Avena had already been sentenced to death for the carjacking homicides. Stenberg also told Sanchez that "Part did not request that he investigate the [carjacking homicides] case at

the guilt or penalty phases." Nor did Part "inform him of any PCP use by Avena."

In another declaration, Paul Mansfield, an experienced capital defense attorney, stated that in a case like Avena's, he would have requested funds to secure investigators and experts, hired a psychologist or psychiatrist to examine the defendant, investigated the defendant's history of drug use and use of drugs at the time of the crime, presented expert testimony regarding the effects of PCP, presented mitigating evidence regarding the defendant's history in all relevant respects, and investigated any other alleged acts of violence in the defendant's history. Mansfield concluded that the fifty-three hours Part spent preparing before the trial and the forty-one hours spent during the trial were "inadequate to properly prepare a capital case without the assistance of some very thorough and professional investigative help and expert assistance as well."

E

The California Supreme Court referred Avena's habeas petition for an evidentiary hearing that began in February 1990. Avena's habeas counsel called Part, Victor Padua, a social historian, two psychiatrists, two capital defense lawyers, and various family members and friends as witnesses.

The evidence presented at the hearing in support of Avena's ineffective assistance of counsel claim at the penalty phase largely mirrored what Avena submitted in his petition: (1) Avena had a long, documented history of drug use that negatively affected his personality and behavior; (2) Avena's social history contained mitigating evidence that could have

been discovered and presented during the penalty phase of his trial, including that he endured an abusive childhood; and (3) according to legal experts in the field, this evidence should have been discovered and presented by his trial counsel during the penalty phase.

1

Avena's habeas counsel documented Avena's history of drug use and presented expert and lay witness testimony indicating that Avena used PCP on the night of the carjacking homicides. Habeas counsel submitted juvenile records dating back to 1978 indicating Avena used marijuana and PCP nearly every weekend. His friends and family testified that Avena smoked PCP on a regular basis. Victor Padua specifically witnessed Avena use "Angel dust," a form of PCP, at least twice a week in the period leading up to the carjacking homicides. The sentencing report from the carjacking homicides corroborated Avena's declaration that he smoked PCP on the night of the crimes.[2] And according to Victor Padua, Avena acted like "he was on PCP" the night of the crimes but Victor could not specifically recall whether he and Avena had smoked PCP that evening.

When Avena smoked PCP, "he wasn't the same person." "He wouldn't talk very much, [h]e'd hold his face a lot, [h]e'd touch his face a lot, [a]nd he couldn't speak very well." He was sometimes in a "zombie"-like state—his eyes would get puffy, he would mumble, and he would have

---

[2] According to the report, Avena told a probation officer that "he had been drinking a beer and smoking a sherm [i.e., a cigarette dipped in PCP] before his two companions came to pick him up and he can hardly remember anything that he did now."

difficulty walking and talking. Other times, he "c[ould] not be still" and would get "aggressive." When Avena smoked PCP, he would say things like "me siento loco"—"I feel crazy" or "I'm real high."

Two psychiatrists, Fred Rosenthal and Orm Analine, who had experience treating PCP users, also testified about the drug's harmful and long-lasting effects. Together, their testimonies explained that symptoms of PCP intoxication vary across individuals and over time for a single person. People on PCP can be "out of control, agitated, [and] impulsive," "may be hallucinating," "may have delusional thoughts," and "often [become] extremely violent and aggressive for what looks like apparently no reasons or mild annoyances." Chronic PCP users also "have a problem in controlling their impulsive emotional behavior once it's started." "Very commonly memory is affected and sometimes after an event or after something happens while a person is intoxicated with PCP their memory of that event is very distorted or non-existent." PCP use can also have "long-lasting effect[s]," beyond the time period in which the person is under the influence, including "flash backs" that are "like the period that they had when they were using the drugs."

Rosenthal concluded that "there was little doubt that [Avena] was under the influence of PCP on that night." Analine concluded that Avena was a chronic PCP user before the carjacking homicides and that the carjacking homicides were affected by the ingestion of PCP.

2

Expert and lay witnesses also testified about Avena's difficult and abusive childhood. Social historian Vincent

Schiraldi testified that Avena's father abused his wife and children, and Avena "took the larger brunt of the beatings because he was the oldest." When Avena's father left the family, Avena's mother moved with the children to Los Angeles. Shortly after the family arrived there, Avena's father found the family and would occasionally live with them between 1971 and 1980. Avena's father beat Avena during this time period, leading Avena to run away from the house. Avena did not speak English when he first moved to Los Angeles, so he struggled academically. He was often teased in school, with other children calling him a "wetback." He began to experiment with drugs at age eleven or twelve and became affiliated with a gang at age fifteen.

In 1977, Avena was committed to a juvenile facility at Camp Fennell for approximately eight months. Then, in 1978, he was committed to the California Youth Authority ("CYA"). The "chair incident" was the impetus for his committal to the CYA. After Avena threw a chair at his father to protect his mother, Avena's father called the police and reported him for assault with a deadly weapon. Avena was sent to the CYA after he was found guilty of the assault.

Family members and friends testified to having loving relationships with Avena. Avena was protective of his siblings; was sweet to his mother, helping to support her financially; and was described as a "wonderful" son.

3

Finally, Avena's habeas counsel presented evidence that Part's representation of Avena was woefully deficient. Although Part had explained that he left case investigation to his investigator, William Stenberg, record evidence and

Stenberg contradicted this assertion. Stenberg told Sanchez that Part never requested he investigate the carjacking homicides case at either the guilt or penalty phases. Further, only one bill exists documenting Stenberg's work and it was from his investigation of the jail homicide, which occurred *after* Avena was sentenced for the carjacking homicides.

Two experienced capital defense attorneys testified that Part's performance was inadequate. Howard Gillingham explained that Avena's history of abuse, school problems, poverty, drug use, and gang activity could have been mitigating factors at the penalty phase. Charles Gessler testified that Avena's PCP use and difficult childhood also could have been mitigating factors, and that he would have spoken to family members and friends about any alleged drug use.

Finally, Avena testified that Part asked him whether he had used drugs the night of the carjacking homicides, and Avena responded that "I drank beer, cognac, and smoked sherms, PCP and marijuana." Avena also testified that he informed the police that he used PCP and marijuana.

In 1996, the California Supreme Court issued an opinion, denying Avena's habeas petition in its entirety. *In re Avena*, 909 P.2d at 1021. In rejecting Avena's ineffective assistance of counsel claim at the penalty phase, the court focused on Part's failure to present evidence of Avena's good character and social history as well as a potential self-defense argument for the jail homicide. *Id.* at 1040–43. The court determined that it did not have to decide whether Part's failures to investigate or call witnesses constituted deficient performance because Avena "fail[ed] to allege sufficient facts to demonstrate prejudice." *Id.* at 1041. According to the

court, "the sheer number of potential witnesses is small," the character declarations Avena submitted were "not particularly detailed" and "fail[ed] to portray [Avena] as an individual," and the evidence in general provided little detail of Avena's childhood that "would have engendered sympathy in a jury." *Id.* at 1043.  The court also believed that Avena's argument that he could show self-defense in the jail homicide was a "dubious proposition" because Avena was not wounded, the victim was wounded multiple times, and deputies saw Avena stab the inmate.  *Id.* at 1041, 1043.  Moreover, deputies discovered him "wearing a towel wrapped around his midsection, a known protective tactic used by jail inmates who anticipate participating in a knife fight." *Id.* at 1040–41.

The court ultimately concluded that, after comparing the "extremely serious nature of the crimes petitioner committed" with the "relatively meager mitigating evidence petitioner has uncovered," it was "not reasonably probable the penalty phase verdict would have been different had the jury heard this mitigating evidence." *Id.* at 1041–42.  Two justices dissented.  *Id.* at 1045–73 (Mosk, J., dissenting); *id.* at 1073–74 (Kennard, J., dissenting).

F

Avena filed a federal habeas petition in 1998.  He filed his first amended federal habeas petition—the operative petition—in 2005.[3]  The petition asserts ineffective assistance

---

[3] Avena filed a second state habeas petition with the California Supreme Court in 1999.  The federal district court held this case in abeyance pending the state court's resolution of Avena's petition.  In 2005, the state court denied Avena's petition.  Following this ruling, Avena amended his federal habeas petition.

of counsel claims at both the guilt and penalty phases of trial. The district court held an evidentiary hearing in 2009 on Part's failure to present mitigation evidence or counter the State's aggravation evidence at the penalty phase. The district court denied Avena's habeas petition but issued a certificate of appealability on Avena's claim of ineffective assistance of counsel claim at the penalty phase.

## II

We review a district court's denial of habeas relief *de novo*. *Earp v. Davis*, 881 F.3d 1135, 1142 (9th Cir.), *cert. denied*, 139 S. Ct. 566 (2018). Because Avena's federal petition was filed after April 24, 1996, we review it under the standards detailed in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Murray v. Schriro*, 745 F.3d 984, 996 (9th Cir. 2014) (citing *Valerio v. Crawford*, 306 F.3d 742, 763 (9th Cir. 2002) (en banc)). Under AEDPA, we must defer to the state court's decision on any claim adjudicated on the merits unless the decision was "contrary to, or involved an unreasonable application" of "clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). Avena argues that the California Supreme Court decision unreasonably applied the Supreme Court's holding in *Strickland v. Washington*, 466 U.S. 668 (1984).

"[C]learly established [federal law] . . . refers to the holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). "A state-court decision is an 'unreasonable application' of Supreme Court

precedent if 'the state court identifies the correct governing legal rule from th[e Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.'" *Murray*, 745 F.3d at 997 (quoting *Williams*, 529 U.S. at 407). We consider only the evidence that was before the state court at the time of its ruling. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

*Strickland v. Washington*, 466 U.S. 668 (1984), constitutes clearly established federal law governing a claim for ineffective of assistance of counsel. *Pinholster*, 563 U.S. at 189. Capital defendants have a constitutional right to the effective assistance of counsel at the guilt and penalty phases of trial. *Strickland*, 466 U.S. at 684–87. To establish that counsel was ineffective under *Strickland*, a petitioner must demonstrate that "counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland*, 466 U.S. at 687).

III

Under the performance prong of *Strickland*, counsel's performance was deficient if it "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "[P]revailing professional norms" at the time of the representation serve as the objective standard of reasonableness under which counsel's performance is measured. *Id.* We apply a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689). When assessing trial counsel's conduct, "hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' [that] investigative decisions are made and by

giving a 'heavy measure of deference to counsel's judgment.'" *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466 U.S. at 689, 691).

At the time of Avena's trial, the prevailing professional norms demanded that trial counsel conduct a thorough investigation of a defendant's background in order to develop a strategy for the penalty phase of trial. *See, e.g.*, *Williams*, 529 U.S. at 396. Indeed, the duty to investigate is a "substantial and important" one. *Wiggins*, 539 U.S. at 524–25. "'[S]trategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Id.* at 528 (quoting *Strickland*, 466 U.S. at 690–91). Accordingly, when a petitioner challenges trial counsel's conduct in not presenting mitigation evidence at the penalty phase, our "principal concern . . . is not whether counsel should have presented a mitigation case[, but instead] . . . whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable*." *Id.* at 522–23.

In denying Avena's first habeas petition, the California Supreme Court did not address whether Avena's counsel performed deficiently at the penalty phase because it concluded that, regardless of any alleged deficiency, Avena failed to demonstrate prejudice. *In re Avena*, 909 P.2d at 1040–41. Accordingly, we review *de novo* counsel's performance. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam).

A

Part rendered deficient performance by failing adequately to investigate Avena's good character and social history, and he has no reasoned or tactical excuse for not doing so.

Up through jury selection, Part billed only fifty-three hours in preparation time for Avena's trial, less than a week's work for most attorneys. From jury selection through the end of the sentencing phase, he billed another forty-one hours. The small number of hours that counsel expended in preparation for Avena's capital trial is a striking initial indication of his deficient investigation for the penalty phase.

Avena's family members also confirm counsel's failure to investigate Avena's background and social history. Avena's mother stated that Part never contacted her before, during, or after Avena's trial. Avena's sister also stated that she was never contacted to testify at Avena's trial. Avena's girlfriend at the time of the carjacking homicides stated that she received a single call after the crimes but was not contacted again.

Statements and testimony from three experienced capital defense attorneys establish that Part's failure to contact family members or investigate Avena's background and social history fell below prevailing professional norms. For instance, Paul Mansfield stated that he would have presented a comprehensive mitigation case of Avena's "history, background, character, mental and emotional conditions, social history, family, employment, interests, friends, past criminal history, and any other area of mitigation." Howard Gillingham testified that Avena's history of abuse at the hands of his father, school problems, poverty, drug use, and

even his gang activity could be mitigating factors at the penalty phase. Similarly, Charles Gessler testified that Avena's difficult and abusive childhood certainly could have been a mitigating factor.

Additionally, neither of the State's arguments excuses Part's failure to investigate Avena's social history and good character. First, the State contends that counsel did not call Avena's relatives to testify because he worried that doing so would open the door to further aggravating evidence of the alleged "chair incident" with Avena's father. However, Part's reliance on this incident as an excuse for not presenting mitigation evidence remains unreasonable given his lack of investigation into the circumstances surrounding it. Conducting an adequate investigation to uncover potential mitigation evidence is a prerequisite for determining the strategic benefit of presenting any of it at the penalty phase. *Wiggins*, 539 U.S. at 523. And foreclosing the option of calling any family members as character witnesses because of a single alleged incident, without further exploration into it, is not a coherent strategy—it is entirely unreasonable. *See id*. at 534. This is especially true when we consider that testimony by character witnesses and the presentation of a defendant's social history and background play a fundamental role in securing confidence in the outcome of the penalty phase. *See, e.g.*, *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) ("In order to ensure reliability in the determination that death is the appropriate punishment in a specific case, the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." (internal citations and quotation marks omitted)), *abrogated on other grounds by Atkins v. Virginia*, 526 U.S. 304 (2002); *Caldwell v. Mississippi*, 472 U.S. 320, 330–31 (1985) ("When we held that a

defendant has a constitutional right to the consideration of [mitigating] factors . . . we clearly envisioned that that consideration would occur among sentencers who were present to hear the evidence and arguments and see the witnesses." (internal citations omitted)). Had he conducted any investigation into this incident, Part would have discovered substantial evidence that Avena acted to protect his mother from his father's abuse.

Second, the State argues that Part cannot be faulted entirely for his failure to present character witnesses because Avena's mother "admitted that she had not been forthcoming with trial counsel at the time of trial." This assertion is not supported by any of the cited testimony. Avena's mother testified only that Part never contacted her and that she never told anyone about her son's PCP use. Competent representation requires counsel proactively to reach out to a defendant's family members and friends to develop an understanding of the defendant's background. *See Wiggins*, 539 U.S. at 522–23; *see also Apelt v. Ryan*, 878 F.3d 800, 830–31 (9th Cir. 2017) (finding deficient performance where counsel did not pursue background information from family members because they lived out of the country and did not speak English), *cert. denied*, 2019 WL 1172280 (U.S. June 17, 2019) (No. 18-836).

B

Part also rendered deficient performance by not investigating Avena's claim of self-defense in the jail homicide to counter the State's use of it as aggravation evidence.

Part admitted that he did not investigate a potential self-defense claim and asserted that he left that task to his investigator. His investigator and the record evidence belie Part's assertion. There is no evidence that Part requested any investigation of the jail homicide in preparation for the penalty phase of the carjacking homicides case.

The State's argument that "reasonable trial counsel could have decided to forgo an unbelievable self-defense argument to avoid alienating the jury" does not excuse Part's performance. Again, our "principal concern . . . is not whether counsel should have presented a mitigation case." *Wiggins*, 539 U.S. at 522–23. "Rather, we focus on whether the investigation supporting counsel's decision not to introduce" evidence to counter the state's aggravating evidence "*was itself reasonable*." *Id.* at 523. Part conducted no such investigation, and his failure to do so was unreasonable. Part's "uninformed strategy [wa]s not a reasoned strategy. It [wa]s, in fact, no strategy at all." *Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008) (citing *Strickland*, 466 U.S. at 690–91).

Thus, Part also rendered deficient performance by failing to investigate or present any mitigation evidence regarding self-defense in the jail homicide, and he had no reasonable or tactical excuse for not doing so.

IV

A

Turning next to the prejudice prong of *Strickland*, we determine whether a petitioner suffered prejudice at the penalty phase by "reweigh[ing] the evidence in aggravation

against the totality of available mitigating evidence" and asking whether "there is a reasonable probability" that "at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 534–37; *see also Wong v. Belmontes*, 558 U.S. 15, 26 (2009) (per curiam) (courts "must consider all the evidence—the good and the bad—when evaluating prejudice"). "A reasonable probability [of a different result] is a probability sufficient to undermine confidence in the outcome" of the penalty phase. *Strickland*, 466 U.S. at 694. Counsel's deficient performance must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Apelt*, 878 F.3d at 831 (internal citations omitted).

Avena's task is more difficult still because the California Supreme Court concluded that he was not prejudiced by Part's performance. *In re Avena*, 909 P.2d at 1040–41. AEDPA's deferential standard thus governs our review of the California Supreme Court's decision. *Murray*, 745 F.3d at 996. Accordingly, the question before us is not whether we believe Avena suffered prejudice and the California Supreme Court was "incorrect" in finding none; instead, we must ask whether the California Supreme Court's determination of no prejudice was "unreasonable—a substantially higher threshold." *Apelt*, 878 F.3d at 832. Yet, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

At the conclusion of the penalty phase, the jury knew almost nothing about Avena except what the prosecution said of him: Avena was a dangerous, subhuman killer. He had killed strangers for no apparent reason. No one, not even family members, testified on his behalf.

In contrast to what was actually presented, a wealth of mitigation evidence could have been presented had Avena's counsel conducted a constitutionally adequate investigation. Mitigation evidence in capital sentencing is "constitutionally indispensable." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *see also Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality opinion) ("[I]n capital cases[,] the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." (internal citations omitted)). "[F]ull consideration of evidence that mitigates against the death penalty is essential . . . ." *Penry*, 492 U.S. at 328.

This is not a case in which mitigation evidence would have "largely duplicated" that which was already presented or would otherwise have little effect on the jury's perception of the defendant. *See Pinholster*, 563 U.S. at 200–01. On the contrary, Avena's good character and social history evidence consists of more than just a few people who knew him saying that he was "generally a good person." *Strickland*, 466 U.S. at 700; *see also Allen v. Woodford*, 395 F.3d 979, 1005 (9th Cir. 2004) (finding no prejudice where mitigating evidence only indicated defendant "could be pleasant"). The evidence "paints a very different picture of [Avena's] background and character than was presented at sentencing." *Apelt*, 878 F.3d at 832.

The testimony of Avena's family members and friends—that Avena was loving and sweet—would have countered the prosecution's characterization of Avena as nothing more than a "killing machine" with a "malignant

heart." Along with social history experts, Avena's family members and friends also would have testified that Avena suffered substantial and continual abuse as a child at the hands of his father. This is exactly the kind of evidence that could have led a jury member—by "reasoned moral judgment"—to show Avena mercy. *Doe v. Ayers*, 782 F.3d 425, 462 (9th Cir. 2015); *see also Williams*, 529 U.S. at 398 (discussing the effect a defendant's social history and background evidence can have on a jury's "appraisal of his moral culpability" even where it does not undermine the prosecution's evidence of the defendant's "dangerousness"). Indeed, "evidence about [a] defendant's background and character is relevant [at sentencing] because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, *may be less culpable than defendants who have no such excuse*." *Boyde v. California*, 494 U.S. 370, 382 (1990) (internal citations omitted).

The extensive evidence of Avena's habitual PCP use, as well as the effects the drug had on his demeanor, also could have aided his defense. Whether or not this evidence was compelling enough to support an actual defense at the guilt phase of Avena's trial, there remained considerable potential for Part to argue during the penalty phase that Avena's habitual PCP use contributed to his violent and erratic behavior on the night of the carjacking homicides. Specifically, had Avena's good character and social history evidence been evaluated alongside the compelling expert testimony about the harmful and long-term effects of PCP, the jury could have "humanize[d]" Avena and evaluated his behavior in the context in which it manifested. *See Mayfield v. Woodford*, 270 F.3d 915, 931–32 (9th Cir. 2001) (en banc)

(finding a death sentence unreliable, in part, because available testimony from friends and family that a defendant's personality changed as a result of his drug and alcohol abuse was never presented at sentencing).

In addition to character evidence and evidence about PCP use, competent counsel also could have presented evidence of self-defense in the jail homicide. This was certainly the most compelling aggravation evidence against Avena. The prosecutor dramatically advanced the argument that Avena was a danger to society even if he remained imprisoned, arguing that Avena "cannot live outside the cage amongst us, and he can't live inside the cage amongst the other tigers." Rather than leaving that forceful assertion unchecked, competent counsel would have presented evidence that, in fact, Avena acted in self-defense. Not only could witnesses to the jail homicide have testified that Avena acted in self-defense, but Avena also presented to a deputy a few days before the incident with wounds on various parts of his body and claimed that someone was out to get him.

B

In sum, the aggravating circumstances presented to the jury were certainly strong: Avena committed two brazen murders during a night of malicious criminal activity; while awaiting trial for these murders, he was implicated in the violent death of another inmate; and, during this same period, he assaulted a police officer. But it would be difficult to find a capital case at the sentencing phase that does not have strong aggravating circumstances. Worse for Avena, the prosecution's case was *all* the jury knew of him.

On the other hand, the mitigation evidence the jury could have learned was extensive and varied:  Avena was loving to and protective of his mother and sister; his father abused everyone in the family, but Avena received the brunt of the abuse; he eventually ran away from home and started using harmful drugs like PCP at a young age; Avena's drug use changed his personality and behavior tremendously and for the worse; the effects of drugs like PCP are long-lasting and detrimental; witnesses to the homicide in the jail would testify that Avena acted in self-defense; and Avena also presented to a deputy a few days before the incident with wounds on various parts of his body and claimed that someone was out to get him.[4]

The complete lack of mitigation evidence during the penalty phase all but ensured Avena's fate because the jury was given no reason to consider whether he deserved anything less than death. *See Williams*, 529 U.S. at 368–69 (reversing a death sentence for ineffective assistance of counsel at the penalty phase despite strong aggravating evidence).

We do not suggest that a state court's conclusion of no prejudice is always unreasonable when defense counsel did not present any mitigation evidence.  But the mitigation evidence here was humanizing, painting Avena's crimes in a different light and providing an explanation for the jail homicide.  When weighing the totality of this mitigation evidence against the aggravation evidence, there remains a

---

[4] The only potential rebuttal aggravating evidence concerned the so-called "chair incident."  But the prospective harm that it could have caused Avena was slight, particularly in light of the testimony that Avena was protecting his mother from physical abuse by his father.

reasonable probability that at least one juror would have determined the circumstances did not warrant death. Moreover, in the unusual circumstances of this case, we hold that no "fairminded jurist[] could disagree." *Harrington*, 562 U.S. at 101.

In assessing prejudice at the penalty phase, the California Supreme Court primarily emphasized the aggravating circumstances. *In re Avena*, 909 P.2d at 1043. With respect to the mitigating evidence, the court (a) concluded that the character evidence was "no[t] very persuasive " because it lacked some detail and because the number of character witnesses—three—was "small " compared to other cases; (b) did not mention the evidence pertaining to Avena's PCP use; and (c) found the self-defense theory pertaining to the jail homicide "dubious" because of the evidence implicating Avena. *Id.*

The number and detail of the character witnesses may not have been expansive, but it was qualitatively distinct from what the jury heard on the subject: nothing. As described above, the PCP evidence potentially humanized Avena and his horrible crimes, yet the state court did not mention this evidence in assessing prejudice. Finally, despite the evidence implicating Avena in the jail homicide, the jury may have found Avena's alleged involvement in the incident less damning, had the jury heard from witnesses that Avena acted in self-defense in jail. *Cf. Apelt*, 878 F.3d at 834 (finding no prejudice, in part, because mitigation evidence did not offer an explanation for a brutal murder or reduce the defendant's responsibility for carrying it out).

For all of the foregoing reasons, the California Supreme Court was objectively unreasonable in concluding that Avena

failed to show prejudice and denying Avena's claim for ineffective assistance of counsel at the penalty phase.

V

In sum, we reverse the judgment of the district court on the certified claim of ineffective assistance of counsel at the penalty phase. We instruct the district court to grant the Writ of Habeas Corpus as to Avena's sentence unless the state court resentences Avena within a reasonable time to be determined by the district court. We do not reach non-certified issues raised in the briefing.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**