**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CRAIG ANTHONY ROSS,
*Petitioner-Appellant*,

v.

RONALD DAVIS, Warden, California
State Prison at San Quentin,
*Respondent-Appellee.*

No. 17-99000

D.C. No.
2:96-cv-02720-
SVW

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted May 24, 2021
Pasadena, California

Filed March 25, 2022

Before: Mary H. Murguia, Chief Judge, and Kim McLane
Wardlaw and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Wardlaw

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Craig Anthony Ross's habeas corpus petition in a case in which a jury sentenced Ross to death after convicting him of three counts of murder, five counts of robbery, and two counts of rape in concert.

Ross claimed that an erroneous aiding and abetting instruction allowed the jury to find him guilty of the first-degree murder counts without making the finding that he had the intent to kill, and thus the imposition of the death penalty violated the Eighth Amendment under *Enmund v. Florida*, 458 U.S. 782 (1982). The panel concluded that the California Supreme Court on direct appeal reasonably rejected this claim. The panel wrote that the state court reasonably concluded that the instructions were adequate for the jury to make the requisite culpability finding, especially in light of the exception to the rule of *Enmund* found in *Tison v. Arizona*, 481 U.S. 137 (1987), and *Tapia v. Roe*, 189 F.3d 1052 (9th Cir. 1999).

Ross also claimed that his trial counsel's failure to investigate and present then available mitigation evidence at the penalty phase was ineffective assistance of counsel in violation of the Sixth Amendment under *Strickland v. Washington*, 466 U.S. 668 (1984). The panel agreed with the district court that counsel's performance during the penalty phase was deficient. But given the entirety of the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

evidence before the jury, Ross's disruptive conduct in front of the jury, and the sure-to-be-admitted rebuttal and impeachment evidence that would follow introduction of the mitigation evidence, the panel concluded that the California Supreme Court reasonably concluded that Ross did not show a reasonable probability that the result would have been different but for counsel's unprofessional errors.

**COUNSEL**

Norman D. James (argued), Law Office of Norman D. James, Hamilton, Montana; Jerry L. Newton (argued), Carmel, California; for Petitioner-Appellant.

Steven E. Mercer (argued) and A. Scott Hayward, Deputy Attorneys General; James William Bilderback II, Supervising Deputy Attorney General; Lance E. Winters and Ronald S. Mathias, Senior Assistant Attorneys General; Gerald A. Engler, Chief Assistant Attorney General; Rob Bonta, Attorney General; Office of the Attorney General, Los Angeles, California; for Defendant-Appellant.

**OPINION**

WARDLAW, Circuit Judge:

Over forty years ago, Craig Anthony Ross participated in three brutal gang-involved home invasion robberies in which three people were murdered. In 1982, a jury convicted Ross of three counts of murder, five counts of robbery, two counts of burglary, and one count of rape in concert. The jury also found that during each offense he was armed with a firearm, and, as to each count of murder, found

special circumstances of robbery-murder, burglary-murder, and multiple murder. On one of the murder counts, the jury found a rape-murder special circumstance. At the penalty phase, the jury returned a verdict of death. Ross now appeals from the denial of his federal petition for a writ of habeas corpus.

Two penalty phase claims are before us. First, Ross claims that an erroneous aiding and abetting instruction allowed the jury to find him guilty of the first-degree murder counts without making the finding that he had the intent to kill, and thus the imposition of the death penalty violated the Eighth Amendment. *See Enmund v. Florida*, 458 U.S. 782 (1982). We conclude that the California Supreme Court on direct appeal reasonably rejected this claim. The state court reasonably concluded that the instructions were adequate for the jury to make the requisite culpability finding, especially in light of the exception to the rule of *Enmund* found in *Tison v. Arizona*, 481 U.S. 137 (1987) and our decision in *Tapia v. Roe*, 189 F.3d 1052 (9th Cir. 1999).

Second, Ross claims that his trial counsel's failure to investigate and present then available mitigation evidence at the penalty phase was ineffective assistance of counsel in violation of the Sixth Amendment under *Strickland v. Washington*, 466 U.S. 668 (1984). Though we agree with the district court that counsel's failure to perform was deficient, given the entirety of the evidence before the jury, Ross's disruptive conduct in front of the jury and the sure-to-be-admitted rebuttal and impeachment evidence that would follow introduction of the mitigation evidence, the California Supreme Court reasonably concluded that Ross did not show a reasonable probability that the result would have been different but for counsel's unprofessional errors.

# I.

Throughout his murder trial, Ross was represented by lead counsel Gerald D. Lenoir, an experienced capital defense attorney. Lenoir was assisted by co-counsel H. Elizabeth Harris, who had tried a single prior capital case. The California Supreme Court in its 1995 opinion in Ross's direct appeal,[1] recited the facts related to Ross's guilt, *People v. Champion*,[2] 9 Cal. 4th 879 (1995), *modified on denial of reh'g* (June 1, 1995), as follows:

> *1. Murders of Bobby Hassan and His Son, Eric*
>
> On the morning of December 12, 1980, Mercie Hassan left her home at 849 West 126th Street, Los Angeles, to go to work. Residing with her were her husband, Bobby Hassan (an unemployed carpenter who sold marijuana and sometimes cocaine), and their four children. Mercie spoke to Bobby on the telephone between 11:00 and 11:30 that morning. Bobby normally picked up their

---

[1] Though Ross does not raise any guilt phase claims on appeal, a summary of the guilt phase evidence is necessary to evaluate Ross's penalty phase claims. *See Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) ("[T]he Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense.") (internal quotation marks and ellipsis omitted); Cal. Penal Code § 190.3(a) (stating that a sentencing jury shall take into consideration, among other relevant factors, "[t]he circumstances of the crime of which the defendant was convicted . . . and the existence of any special circumstances").

[2] Ross was jointly tried and convicted for the three murders with his cousin and fellow gang member Steve Champion.

14-year-old son, Eric, from school at noon and brought him home for lunch.

Sometime around noon, Elizabeth Moncrief, a nurse working for an elderly woman across the street from the Hassan residence, saw Bobby and Eric return home.  Half an hour later, she saw a large gold or cream-colored Cadillac containing 4 Black males, ages 19–25, parked in front of the Hassan home. Moncrief went outside and took a close look at the car.  About five minutes later, she saw two of the men get out of the car and knock at the Hassans' door.  There was a struggle at the door, and the two men entered.  The other two men then got out of the car and entered the house, and someone closed the curtains in the Hassan residence.

Later, Moncrief saw all four men leave the house.  One was holding a pink pillowcase with something in it; the others were carrying paper bags containing unknown items. Moncrief was able to get a particularly good look at the last man who left the house, a tall man with heavy lips, a scar on his face, and either a chipped tooth or a gap between his teeth.  She paid closer attention to this man because she had seen him once in Helen Keller Park, which was just across the street.

Mercie Hassan returned home at about 3:30 p.m.  The house had been ransacked. Part of the lunch she had prepared for Bobby and Eric was on the floor, along with

wrapping paper from the children's Christmas presents. Several of the presents were missing, as were some colored pillowcases and a .357-caliber Ruger Security Six revolver. Police, called to the scene, found the bodies of Bobby and Eric Hassan in the bedroom, lying on the bed. Each had been shot once in the head. Bobby's hands were tied behind his back, and three rings and a necklace he customarily wore were missing.

Defendant Champion was arrested on January 9, 1981. When arrested, he was wearing a yellow metal ring with white stones and a gold chain necklace that contained a charm bearing half of a king-of-hearts playing card. Mercie Hassan identified the ring and charm as belonging to her husband, Bobby. Latent fingerprints lifted from the Christmas wrapping paper and from a white cardboard box matched defendant Ross's fingerprints.

[. . .]

A ballistics expert testified that Bobby Hassan was killed by a .357-caliber bullet with rifling characteristics; the latter are produced by the gun that fired the bullet, and were described by the expert as "six lands and grooves with a left hand twist." The expert also testified that most Colt revolvers produce these particular characteristics. The prosecution produced photographs, found in

defendant Champion's home, showing each defendant holding a Colt revolver.  [. . .]

## 2.  *The Murder of Michael Taylor*

During the evening of December 27, 1980, three men came to the door of Cora Taylor's apartment at 11810 ½ Vermont Avenue, not far from the Hassan home.  Residing with Cora were her son Michael (who sold marijuana) and her daughter Mary.  The men, one of whom Cora identified at trial as defendant Ross, walked into the living room and asked to speak to Michael.  When Michael and Mary came out of the next room, accompanied by William Birdsong, a friend who was visiting, one of the men, whom Cora and Mary later identified as Evan Malett, grabbed Birdsong.  A struggle ensued, which ended when Malett drew a gun and ordered Cora, Mary, Michael, and Birdsong to sit on the bed.  Malett then demanded money and drugs.  When Mary said they did not have any, one of the three men hit her in the jaw with his fist.  The men then ordered the Taylors and Birdsong to lie face down on the bed, opened Cora's purse, and ransacked the premises.  While the three robbers were rummaging through the apartment, a fourth man (apparently a lookout) came to the door but did not enter.

At Cora's urging, Michael told the robbers that there was money in a box in the kitchen.  At that point one of the men, whom Mary

later identified as defendant Ross, grabbed Mary by the hair and forced her to go into the bathroom, where he raped her. He then left the bathroom, returning moments later to rape Mary again. Thereafter, Malett entered the bathroom and unsuccessfully tried to rape Mary.

The three men then ordered Birdsong and Cora to join Mary in the bathroom. A short time later, Cora and Mary heard a shot. After a few minutes, they left the bathroom and found Michael in the living room, dead. A prosecution expert testified that Michael had died from a single shot from a high-powered weapon (such as a .357 magnum), fired at close range. The agent also testified that the gun used to kill Bobby Hassan could not have been the murder weapon, but that the bullet could have been fired by the .357-caliber Ruger stolen from the Hassan home.

Missing from the Taylor's apartment was an 8-track tape player. Also missing was a Christmas present—a photo album—which had been taken out of its wrapping.

Later that night, shortly after midnight, Los Angeles County Deputy Sheriff Ted Naimy saw a brown Buick automobile that contained four Black males and did not have its headlights turned on in the neighborhood where Michael Taylor had been murdered. As the Buick pulled alongside of him, Deputy Naimy and his partner ordered it to stop.

Instead, the car sped away. As the deputies pursued the Buick, it went out of control, struck a curb, and came to a halt. Its four occupants jumped out of the car and ran. Inside the car, the deputy found the 8-track tape player stolen from the Taylor apartment and the .357-caliber Ruger revolver stolen from the Hassan home. The gun contained two live rounds and an empty shell casing, and smelled as if it had recently been fired. Under the car, Deputy Naimy found the photograph album stolen from the Taylors.

Police searched the neighborhood for the occupants of the Buick. They found Evan Malett hiding in a backyard of a nearby house, in which defendant Champion was living.

Natasha Wright, the Taylors' next-door neighbor, identified defendant Ross at trial as one of the men she saw arrive at the Taylors' apartment. Prosecution experts testified that two latent fingerprints lifted from the bathtub in the Taylors' apartment belonged to Ross, and that spermatozoa found on Mary's pants were consistent with Ross's blood type, which is shared by roughly 11 percent of the population. [. . .]

*3. Other Prosecution Evidence at the Guilt Phase*

[. . .]

The prosecution also offered expert testimony that both defendants were members of the Raymond Avenue Crips, a gang whose territory encompassed the houses where the murders occurred; that defendant Ross's nickname in the gang was "Little Evil" or "Evil;" and that defendant Champion's gang nickname was "Trecherous," "Trech," or "Mr. Trech," all standing for treacherous. [. . .]

In addition, the prosecution introduced a tape recording of a conversation between defendants that took place in a bus transporting them from jail to court.

[. . .]

In the two tape-recorded conversations, which contained numerous profanities, defendants fantasized about taking a "stroll" out of the jail and about "blow [ing] up" the driver of the transport van and escaping. They spoke in derogatory terms of a man named Ishimoto, apparently a guard at the jail, calling him a "little Jap," a "Buddha head motherfucker," and a "little bastard Buddha head." Their conversations also included the following interchange, in which they talked about Bobby Hassan, Jr., the son of victim Bobby Hassan and a "junior member" of defendants' gang, the Raymond Avenue Crips. . . . According to the prosecution, in this interchange defendants discussed whether Bobby Hassan, Jr., had told the

police about defendants' participation in the murder of his father and brother, and discussed whether the bed on which victims Bobby and Eric Hassan were lying when they were shot was a waterbed:

CHAMPION: "Man, shit. I saw that mother fucker Bobby Hassan.

ROSS: "Bobby Hassan what you mean?

CHAMPION: "His father—the one that got killed.

ROSS: "A picture?

CHAMPION: "No, I saw him. He's in the courtroom.

ROSS: "What you mean? He's dead.

CHAMPION: "No (inaudible) (laughs) the other (inaudible).

ROSS: "Oh, the Raymond Crip.

CHAMPION: "Yeah.

CHAMPION: "He always be at all the courts, Cuz.

ROSS: "Yeah?

CHAMPION: "(Laughs) Him and his mother
. . . his other brother and shit. I look at him
raw—the mother fucker (laughs).

ROSS: "He's in court (inaudible)?

CHAMPION: "Yeah, he be at all my courts.
I look at him raw, the mother fucker (laughs).
I was sleepy and just woke up . . .

ROSS: "He ain't never said nothing?

CHAMPION: "No, he's a punk ass.

ROSS: "They supposed to be witnesses?

CHAMPION: "No, they just come to see
what's happening with me. (Laughs) See if
I'm going to get convicted and shit.

ROSS: "(Inaudible)

CHAMPION: "(Inaudible)

ROSS: "Was that a waterbed in that room?

CHAMPION: "Uh-uh."

Defendant Ross offered no evidence at the
guilt phase.

*Champion*, 9 Cal. 4th at 898–901, 909–10.

After one day of deliberation, the jury found Champion
and Ross guilty of burglarizing the Hassan home and

robbing and killing Bobby and Eric Hassan.  It also convicted Ross of burglarizing the Taylor residence, of robbing Cora, Michael, and Mary Taylor, of raping Mary, and of murdering Michael.  As the verdicts were being read, Ross and Champion rose and attempted to leave the courtroom, participating in the following exchange with the trial court:

> THE COURT: Mr. Champion, Mr. Ross, we're not finished.
>
> CHAMPION: Not no more to hear.
>
> THE COURT: Have a seat until we finish reading the verdicts.  Mr. Champion, Mr. Ross—
>
> CHAMPION: What more I gotta hear?  I ain't got no more to hear.
>
> THE COURT: We have further proceedings. Mr. Ross, Mr. Champion, have a seat.
>
> CHAMPION: I ain't sitting down in this court.  Let me go back in there.
>
> THE COURT: Mr. Ross, Mr. Champion, have a seat.
>
> CHAMPION: I'm not sitting down, your Honor, simple as that.
>
> THE COURT: All right.  Ladies and gentlemen of the jury, I'm going to excuse you at this point from the courtroom.  Want

you to go into the jury room just a few
minutes.  Do not discuss this case—

(The defendants resume their seat at counsel
table).

THE COURT: All right.  It will not be
necessary at this time.  Continue reading the
verdicts.

As the verdicts continued to be read, Ross and Champion
again rose and were escorted out of the courtroom after the
following exchange:

THE COURT: Mr. Champion, Mr. Ross—

CHAMPION: Fuck that, man.  Get out this
mother fucker, man.

The California Supreme Court also recited the evidence
presented at the penalty phase:

At the penalty phase of the trial, the
prosecution presented the following evidence
of violent criminal conduct involving
defendant[] Ross.

[. . .]

On July 29, 1977, Mark Howard, a gang
member, was in Helen Keller Park when
Walter Gregory approached and said that
defendant Ross wanted to talk to him.
Howard walked to another part of the park
and spoke to Ross, who was with a group of

people.  Ross demanded that Howard return
a radio that Howard had taken from Gregory.
Howard said he took the radio because
Gregory owed him money.  When Howard
refused to return the radio, Ross produced a
revolver, and said that if Howard did not
return the radio he would blow Howard's
head off.    Howard then slapped Ross,
whereupon Ross shot Howard six times in the
stomach and the chest.  Howard recovered,
but a bullet remains lodged close to his spine,
and his ability to use his left leg is seriously
impaired.    As a result of this incident,
defendant Ross entered a plea of guilty to a
charge of assault with a deadly weapon, and
was sentenced to three years in prison.  [. . .]

*Champion*, 9 Cal. 4th at 901–04.

Though Ross's defense counsel failed to call any
witnesses in mitigation, they did introduce three pieces of
evidence by stipulation and judicial notice.[3]  First, the parties
stipulated that, if called, the prosecution's gang expert would
have testified that Mark Howard, who had been another
shooting victim of Ross, was previously a "peripheral
member" of two different gangs.  This evidence impeached
Howard, who had testified he was never a member of a gang.
Second, the parties stipulated that Ross was twenty-one
years old at the time of the three murders.  Finally, at
defendants' request, the trial court took judicial notice that a
jury had found Evan Malett guilty of eight felonies for his
role in the Taylor home invasion murder, that one of the

---

[3] The California Supreme Court incorrectly stated that "Ross offered
no evidence at the penalty phase."  *Champion*, 9 Cal. 4th at 904.

felonies was first degree murder with the personal use of a firearm, and that the total sentence Malett received was 46 years to life imprisonment. At the prosecution's request, the court also took judicial notice that the jury in Malett's case was instructed that personal use of a firearm included merely displaying the firearm or striking someone with it, and that the jury found not true the allegation that Malett personally inflicted great bodily injury on Taylor.

Arguing for the death sentence, the prosecutor asserted that Ross continued to present a danger to society. The prosecutor relied not only on Ross's recorded statements about committing a violent escape from custody, but also "the display that was put on . . . when the verdicts were rendered." According to the prosecutor, when the verdicts were being read, "Mr. Ross engaged in a confrontation with the guards here and almost got into a fight with them." As a result, Ross was not "the kind of person from whom we can protect not only the society outside of prison but society inside prison by incarcerating him for the rest of his life."

The prosecutor also emphasized the "brutal and cold-blooded" nature of the murders and pointed to Ross's shooting of Mark Howard as "a[nother] murder where the victim, fortunately, did not die." The prosecutor, however, conceded that "we didn't prove beyond a reasonable doubt, I thought, that either of the defendants actually was a shooter in any of these murders." Nevertheless, the prosecutor maintained that the evidence showed that Ross was the leader because: (1) he had "the nerve" to shoot Howard in broad daylight; (2) he was the one who previously had spent time in state prison; (3) he told Mary that he was the leader; (4) he did most of the talking during the recorded conversation with Champion; and (5) when the verdicts were being read, "he was the one who first got up and in mock

indignation started to walk toward the lockup, [and] Mr. Champion followed."

The prosecutor anticipated the defense's argument that Ross deserved a life sentence because Malett's jury found him guilty of being the actual shooter, and yet did not impose the death penalty. The prosecutor first distinguished Malett's case from Ross's because Malett was found guilty of the Taylor murder only, whereas Ross was found guilty of the Hassan murders as well. Moreover, unlike in Ross's case, the jury in Malett's case did not find true the special circumstance allegations. Additionally, based on the jury instructions, Malett's conviction for personal use of a firearm did not necessarily mean that the jury found him guilty of being the shooter in the Taylor murder; in fact, the jury actually found untrue the allegation that Malett personally inflicted great bodily injury on Taylor. Finally, the prosecutor noted that "it's not the test for your purposes as to whether or not this case is more or less aggravated than some other case."

For his part, Ross's counsel Lenoir argued that a sentence less than death meant that Ross would "die in prison" because escape from Folsom prison was "an utter impossibility." According to Lenoir, the question was "whether or not [Ross] c[ould] be useful by making license plates" because "[t]hat's where they're made, prison."

Comparing Ross's case to Malett's, Lenoir pointed out that, unlike Malett, Ross was not charged with the personal use of a firearm or the infliction of great bodily injury on Taylor. Yet, while "Malett c[ould] look forward to getting out of jail and being back on the streets," Ross "c[ould] never dream of getting out."

As for Ross's outburst during the reading of the verdicts, Lenoir noted, and Champion's counsel agreed, that Champion was the one who stood up first. Additionally, Lenoir claimed that the courtroom bailiff "ha[d] [no] problems" with Ross until "two persons from the audience," who apparently were plainclothes deputies, "ran over towards" him and Champion as they were walking to the lock-up area.

Lenoir also attempted to mitigate the assault on Mark Howard. He explained, "I don't say that [Howard] deserved to have been shot, but certainly he instigated it by slapping Ross." Moreover, Lenoir noted that, even though Howard "denied being connected with any gang," the prosecution "graciously . . . assisted me in . . . entering into the stipulation" that Howard in fact had gang affiliations.

Finally, Lenoir argued that there were four specific mitigating circumstances. First, the jury "c[ould] reasonably infer that Mr. Ross behaved during the two years he was in prison" for the Howard shooting because "if there was one black mark on [his] record[,] . . . it would have been presented." Second, because Ross was then only twenty-three years old, he had "a long time [remaining in his life] to think about one thing, what I'm in [prison] for." Third, Ross told Mary in the bathroom that "he would see [that her] mother was not hurt, and [her] mother was not hurt." Lastly, "it ha[d] been conceded that there [wa]s no evidence that Ross had a gun at any time during these actions."

The jury began penalty phase deliberations, and, after two days, delivered death verdicts against Ross and Champion.

## II.

Ross appealed his convictions and his sentence to the California Supreme Court. The state court affirmed both his convictions and his sentence but struck as duplicative all but one of Ross's multiple murder special circumstances. *Champion*, 9 Cal. 4th at 952. The state court also addressed Ross's *Enmund* claim. It held that, although the jury instructions inadequately described the mens rea for aiding and abetting, that error was harmless because the instructions on the special circumstance allegations, found true by the jury, required that the "defendants shared the intent of the killers when they aided and abetted the murders." *Id.* at 928–29.

Ross concurrently filed a habeas petition in the California Supreme Court, in which he raised ineffective assistance of counsel at the penalty phase. *In re Ross*, 10 Cal. 4th 184, 187 (1995). The state court issued an order to show cause and appointed a Los Angeles Superior Court judge as a Referee to take evidence and make findings as to whether trial counsel was ineffective in the penalty phase for failing to present available mitigation evidence. *Id.* at 189. Specifically, the state court asked the Referee to make six findings:

> 1) What mitigating character and background evidence could have been, but was not, presented by petitioner at his penalty trial?
>
> 2) What investigative steps by trial counsel, if any, would have led to such items of evidence?

3) What investigative steps, if any, did trial counsel take in an effort to gather mitigating evidence to be presented at the penalty phase?

4) What tactical or financial constraints, if any, weighed against the investigation or presentation of mitigating character and background evidence at the penalty phase?

5) What evidence damaging to petitioner, but not presented by the prosecution at the guilt or penalty trials, would likely have been presented in rebuttal if petitioner had introduced any such mitigating character and background evidence?

6) Did petitioner himself request that either the investigation or the presentation of mitigating evidence at the penalty phase be curtailed in any manner? If so, what did petitioner request?

*Id*. at 189–90.

The Referee conducted an evidentiary hearing (known as a "reference hearing" under California law), took extensive evidence, answered the six questions asked by the state court, and then offered his opinion that had counsel performed adequately and presented the mitigating evidence, there was a reasonable probability that Ross would not have been sentenced to death. *Id.* at 189–201. The California Supreme Court accepted the Referee's factual determination as to the then available mitigation evidence.

*Id.* at 205.  It upheld most, but not all, of the Referee's factual findings, but disagreed with its legal conclusions, which it reviewed de novo.  The court "accept[ed] for purposes of discussion that [counsel's] performance was indeed deficient," *id.* at 201, but did not "decide whether counsel's performance was truly deficient, or merely obscured by the fog of time," *id.* at 204, as nine years had elapsed between the trial and the reference hearing.  Noting that it had deliberately not asked the Referee to opine on the ultimate question of whether Ross was prejudiced by counsel's performance, the court did not find the Referee's conclusion as to prejudice persuasive, particularly as the record reflected that the Referee had not reviewed the trial record to compare the actual trial with the hypothetical trial that would have occurred had counsel performed effectively. The state court concluded that although the mitigating evidence was substantial, it did not stand alone, but was "subject to substantial impeachment and potentially devastating rebuttal."  *Id.* at 205.  "[C]omparing the trial as it actually occurred with the trial as it would have been with the mitigating evidence," the California Supreme Court determined that Ross was not prejudiced.  *Id.* at 213.

Ross then sought federal habeas relief in the Central District of California under 28 U.S.C. § 2254. *Ross v. Davis*, No. CV 96-2720 SVW, 2017 WL 2374101, at *1 (C.D. Cal. Apr. 26, 2017).  The district court held that the California Supreme Court reasonably concluded that counsel's deficient performance at the penalty phase did not prejudice Ross and properly denied his *Enmund* claim in light of the *Tison* exception.  *Id.*, at *20, 53.  The district court then granted a certificate of appealability as to the *Strickland* claim, which we expanded to include the *Enmund* claim.

## III.

We have jurisdiction pursuant to 28 U.S.C. §§ 1291, 2253(a). We review a district court's denial of habeas relief de novo. *Avena v. Chappell*, 932 F.3d 1237, 1247 (9th Cir. 2019), *cert denied*, 140 S. Ct. 1137 (2020); *Sanders v. Cullen*, 873 F.3d 778, 793 (9th Cir. 2017).

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, controls our analysis of Ross's petition for both his *Enmund* claim and his *Strickland* ineffective assistance of counsel claim. Under AEDPA, we must defer to the state court's decision with respect to any claim adjudicated on the merits unless the decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "This is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citations omitted). Our review is "limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

For Ross's ineffective assistance of counsel claim, "*Strickland v. Washington* and its progeny constitute the clearly established federal law." *Andrews v. Davis*, 944 F.3d 1092, 1107–08 (9th Cir. 2019) (en banc) (citing *Pinholster*, 563 U.S. at 189, and *Strickland*, 466 U.S. at 668). To establish ineffective assistance of counsel under *Strickland*, Ross must demonstrate two elements: first, that defense counsel's performance was deficient, and second, that the deficient performance prejudiced the defense. Prejudice is

shown where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 694. Because AEDPA guides our review, the question before us is whether the California Supreme Court "applied *Strickland* to the facts of [t]his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 699 (2002). "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quotations and citations omitted). In determining whether a state court decision is an unreasonable application of *Strickland*, "[w]e consider only the evidence that was before the state court at the time of its ruling." *Avena*, 932 F.3d at 1247 (quoting *Pinholster*, 563 U.S. at 182).

## IV.

Ross was not charged with or proven to be the actual killer of either Taylor or the Hassans.[4] He contends that the State was required to prove he had the specific intent to commit murder to impose the death penalty. Two Supreme Court cases decided before the California Supreme Court affirmed Ross's convictions and death sentence on direct appeal clearly establish the law governing when a defendant who is convicted of felony murder, but who is not the actual killer, may be given a sentence of death: *Enmund v. Florida*, 458 U.S. 782 (1982) (decided two months before Ross's trial began), and *Tison v. Arizona*, 481 U.S. 137 (1987).

---

[4] According to the California Supreme Court, Evan Malett was charged with and convicted of the murder of Michael Taylor. *In re Ross*, 10 Cal. 4th at 210.

In *Enmund*, the Supreme Court reversed the death sentence of a Florida man under that state's felony-murder rule. *Enmund*, 458 U.S. at 801. Enmund's role in the robbery was to wait in the car by the side of the road, while two others robbed the elderly victims, and then to drive the get-away car. *Id.* at 784. The Court focused on Enmund's culpability—not that of the co-defendants who committed the murders. Because Enmund did not kill, attempt to kill, or have any intention of participating in or facilitating a murder, his culpability was "plainly different" from that of those who committed the murder. *Id.* at 798. The Court, therefore, held that imposition of the death sentence was impermissible under the Eighth Amendment. *Id.*

*Tison* presented more egregious facts. There, the three Tison brothers "helped their father and his cellmate—both convicted murderers—escape from prison, armed them with shotguns, helped flag down and kidnap a family on an isolated road, drove the family [which included a two-year-old] to a remote site, and then stood by as their father and his cellmate murdered [them]." *Dickens v. Ryan*, 740 F.3d 1302, 1311 (9th Cir. 2014) (en banc) (citing *Tison*, 481 U.S. at 139–41). The Court distinguished the Tisons' culpability from Enmund's: "their degree of participation in the crimes was major rather than minor, and the record would support a finding of the culpable mental state of reckless indifference to human life." *Tison*, 481 U.S. at 151. The Court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement" for imposition of the death penalty. *Id.* at 158.[5]

---

[5] "[T]he reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death

Thus, following the Supreme Court's decisions in *Enmund* and *Tison*, the Eighth Amendment permits imposition of the death penalty in the case of a "felony murderer who actually killed, attempted to kill, or intended to kill." *Id*. at 150. It also permits the imposition of the death penalty in the case of a felony murderer "whose participation [in the felony] is major and whose mental state is one of reckless indifference to the value of human life." *Id*. at 152.

## A.

The State first argues that Ross's *Enmund* claim is procedurally barred. We disagree. The State mistakenly asserts that Ross's *Enmund* claim was raised for the first time in his successive 1999 state habeas petition, which the California Supreme Court denied on the merits as untimely under *In re Robbins*, 18 Cal. 4th 770, 780–81 (1998), and barred under *In re Dixon*, 41 Cal. 2d 756, 759 (1953), because it was not raised on direct appeal when it could have been. But Ross challenged his death sentence under *Enmund* on direct appeal, arguing in his opening brief that the instructions permitted his death sentence "without even a determination that [he] intended to commit a felony, much less intended to kill," and referencing *Enmund*. Ross again referred to *Enmund* error in his reply brief on direct appeal, where he argued that the State had failed to respond to it as

_____

represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." *Tison*, 481 U.S. at 157–58. This is because the "reckless indifference to the value of human life may be every bit as shocking to the moral sense as an 'intent to kill.' Indeed it is for this very reason that the common law and modern criminal codes alike have classified behavior such as occurred in this case along with intentional murders." *Id*. (citations omitted).

an issue. And, in a supplemental brief filed after *Tison v. Arizona* was decided, Ross argued that "[s]ince it cannot be determined from the present record that any finding of intent to kill was made, reversal is required under *Enmund v. Florida*, *Tison v. Arizona*, and their progeny." Because a claim is exhausted for federal habeas purposes when it is "fairly presented to the state courts," *Picard v. Connor*, 404 U.S. 270, 275 (1971), Ross's repeated challenges to his death sentence on *Enmund* grounds in his direct appeal are sufficient to preserve the claim for habeas relief.

### B.

### 1.

Ross contends that the jury instructions given at his state trial negated *Enmund*'s requirement of proof that he killed, attempted to kill, or intended to kill the Hassans or Michael Taylor, primarily because *Enmund* "held that it was a violation of the Eighth Amendment to impose the death penalty under the felony murder rule or as an aider and abettor" in the absence of such proof." He also argues that the California Supreme Court's denial of this claim was contrary to and an unreasonable application of the Supreme Court decisions in *Enmund*, *Tison*, and *Cabana v. Bullock*, 474 U.S. 376 (1986). On habeas review, we "must examine the entire course of the state-court proceedings . . . to determine whether, at some point in the process, the requisite factual finding as to the defendant's culpability has been made." *Id.* at 387. If the requisite finding has been made, it is presumed correct under 28 U.S.C. § 2254(d), "and unless the habeas petitioner can bear the heavy burden of overcoming the presumption," his *Enmund* claim fails. *Id.* at 388.

As the California Supreme Court acknowledged,[6] the jury instruction on aiding and abetting liability was inadequate to describe the specific intent required to convict Ross of aiding and abetting the three killings. *Champion*, 9 Cal. 4th at 929. The instruction allowed Ross to be convicted if the murders were "the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged," or "if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages, or instigates by act or advice the commission of such crime." *Id.* at 927–28 nn.17–18. This instruction was given in error because it was "sufficiently ambiguous" to permit conviction upon the "finding of an intentional act which aids, without necessarily requiring a finding of an intent to encourage or facilitate the criminal offense." *Id.* at 928.

Despite the erroneous aider or abettor instruction, the California Supreme Court determined that the error was rendered harmless by the special circumstances instruction. The jury was instructed that it could find the special circumstances true "if defendant was not the actual killer" only if it found that he "intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer in the commission of the murder in the first degree." *Id.* at 929. The California Supreme Court reasoned that the import of this instruction was reinforced by the prosecutor, who in his closing argument explained, "[i]t

---

[6] The court never once characterized this as an *Enmund* claim, but instead relied on analogous state law to discuss the substance of that claim. *Champion*, 9 Cal. 4th at 927–29. Under AEDPA, however, "a state court's decision need not cite or even be aware of controlling Supreme Court precedent, so long as it does not contravene those precedents." *Andrews*, 944 F.3d at 1116–17.

must therefore be established, before you can convict defendants of special circumstances, that . . . they share, along with the trigger man, the intent that these victims perished in the course of these crimes." *Id.* at 928–29. Therefore, the California Supreme Court concluded, "when the jury in this case found the special circumstance allegations true, it also necessarily found that defendants shared the intent of the killers when they aided and abetted the murders." *Id.* at 929. Thus, the erroneous aiding and abetting instruction did not prejudice Ross.

This conclusion was neither "contrary to" nor an "unreasonable application of" *Enmund*. *Enmund*'s culpability requirement for imposition of the death penalty is proof beyond a reasonable doubt that Ross killed, attempted to kill, or intended to kill the Hassans and Michael Taylor. Because the prosecution offered no evidence to prove Ross was the actual killer, the jury could find true the special circumstances allegations only if it found Ross had the intent to assist in killing the victims. And the jury found true the multiple murder special circumstances, under instructions that required a finding of a shared intent to kill. *Id.*; *see also People v. Neely*, 6 Cal. 4th 877, 898 (1993) (holding that a felony-murder special circumstance instruction "properly required that the jury find that defendant, if he was only an aider and abettor, had the intent to kill"); *People v. Pinholster*, 1 Cal. 4th 865, 954 (1992) (explaining that a special circumstance instruction requiring that defendant "intentionally aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer" means the jury forms a determination on whether the defendant had the intent to kill) (emphasis omitted); *People v. Sanders*, 51 Cal. 3d 471, 516–17 (1990) (same); *People v. Warren*, 45 Cal. 3d 471, 487 (1988) (same).

The state court's determination that the special circumstances instruction included the necessary specific intent to satisfy *Enmund*'s culpability requirement was reasonable. We have previously addressed an inadequate aiding and abetting instruction in a pre-AEDPA case. In *Tapia v. Roe*, the aiding and abetting instruction given to the jury was erroneous because "it failed to instruct the jury to find 'intent to encourage or facilitate the criminal offense.'" *Tapia*, 189 F.3d at 1056 (quoting *People v. Beeman*, 35 Cal. 3d 547, 561 (1984). We found the error harmless under either the *Brecht v. Abrahamson*, 507 U.S. 619 (1993) or the *Chapman v. California*, 386 U.S. 18 (1967) standards of review, in light of the jury's separate determinations that the defendant was guilty of lying-in-wait and multiple-murder special circumstances, which necessarily showed that the jury found the defendant had or shared the specific intent to kill both of the victims. *Tapia*, 189 F.3d at 1056–57. This was the "equivalent" of finding the erroneously omitted intent element of aiding and abetting. We concluded "if the jury did find Tapia guilty on an aiding and abetting theory, rather than as the actual perpetrator, the omission of the intent element from the aiding and abetting instruction could not have had an 'injurious effect or influence in determining [their] verdict,' *Brecht*, 507 U.S. at 637, and was 'harmless beyond a reasonable doubt,' [under] *Chapman*, 386 U.S. at 24." *Id.* at 1057.

This case is distinguishable from the circumstances presented in *Cabana*. There, the Court invalidated a death sentence imposed under a Mississippi law that allowed any robbery participant to be convicted of capital murder "notwithstanding the defendant's own lack of intent that any killing take place." *Cabana*, 474 U.S. at 379. The jury instructions allowed the conviction based on an intent to rob without any finding of an intent to kill. *Id.* at 380. Because

"the jury may well have sentenced [the defendant] to death despite concluding that he had neither killed nor intended to kill; or it may have reached its decision without ever coming to any conclusion whatever on those questions," the Court found the death sentence constitutionally inadequate under *Enmund*.   *Id.* at 384.   Here, by contrast, the special circumstances instruction required the jury to make the finding satisfying *Enmund*.

### 2.

Moreover, to the extent Ross alternatively contends that there was insufficient evidence from which a jury could find major participation and reckless indifference under *Tison*, we disagree, as Ross was a major participant in the crimes committed and demonstrated a reckless indifference to human life.

### a.

First, there was ample evidence that Ross was a major participant in the felonies.   Our decision in *Dickens* is instructive.   There, we rejected an assertion of *Enmund* error, reasoning that Dickens's participation in the two murders was less like that of Enmund's passive get-away role and more like the conduct of the Tison brothers.   *Dickens*, 740 F.3d at 1311.   As in *Tison*, Dickens participated in the events leading up to the killings of two victims.   Dickens suggested to his co-defendant Amaral, who had a history of violence, that they plan a robbery, *id.* at 1306, and then he drove Amaral to a highway rest site where the robbery was to take place and waited for three hours until their chosen victims arrived, *id.* at 1307.   Dickens then watched and waited while Amaral used Dickens's gun to rob and murder the victims.   *Id*.   Dickens made no effort to help the victims but picked up Amaral and drove to Dickens's brother's

house, where the pair burned the stolen wallet, split the cash, and went their separate ways. *Id.* at 1308. "In short, Dickens was actively involved in every aspect of the deadly crime—suggesting they undertake the robbery, planning the robbery, staking out the crime scene, selecting the victims, arming Amaral with a handgun, watching the murders, aiding Amaral's escape, destroying evidence, and helping Amaral evade capture." *Id.* at 1311.

Here, like Dickens, Ross was "present at the murder site and did not interfere with the murders." *Id.* at 1311. In fact, Ross was even more actively involved in the crimes resulting in the Taylor and Hassan murders. Ross's participation in the Hassan robbery was demonstrated through the fingerprint evidence found on the wrapping paper inside the Hassan home, indicating Ross had entered the house and participated in the robbery while the killings took place. *Champion*, 9 Cal. 4th at 898. Days later, after participating in the Hassan robbery where two victims were shot and killed, Ross took an active role in the Taylor home-invasion robbery, raped one of the victims twice, told her that he was the leader of the group ransacking the house, and assisted in separating Mark Taylor from the rest of the family just before Taylor was shot and killed. *Id.* at 899–901. Ross "continued the joint venture when he . . . failed to report the crimes." *Dickens*, 740 F.3d at 1311 (quotations omitted). And Ross could have anticipated the use of deadly force, even if he never pulled the trigger himself, because he knew his colleague "had [a] weapon with him for the robberies." *Id*.

As in *Dickens*, Ross "was actively involved in every aspect of the deadly crime," and was thus "clearly a major participant." *Id*. And because "*Tison* does not illuminate the precise line where a defendant's conduct becomes major

participation . . . even assuming [Ross's] conduct falls into a grey area between *Enmund* and *Tison*, we must defer to the [California] Supreme Court's conclusion." *Id.* at 1312.

b.

Ross also "knowingly engaged" in the home-invasion robbery, an activity "known to carry a grave risk of death." *Tison*, 481 U.S. at 157. This mental state "may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." *Id.* at 157–58.

We have previously rejected the argument that armed robbery is not a crime known to carry a grave risk of death. *See Dickens*, 740 F.3d at 1314. Ross does not attempt to argue, nor are we aware of any authority, to the contrary. And the armed robberies in this case posed even graver risk of death as they were gang-orchestrated home invasion robberies of small-time drug dealers. *Champion*, 9 Cal. 4th at 898–901; *see also United States v. VonWillie*, 59 F.3d 922, 929 (9th Cir. 1995) (accepting that drug dealers often possess and use weapons to protect their drugs and intimidate potential buyers). Ross knew at least one of his colleagues had a gun. *Champion*, 9 Cal. 4th at 900. The purpose of the unlawful entry was to look for drugs and money associated with drug sales. *Id*. This is precisely the type of activity that is known to carry a grave risk of death. *See Dickens*, 740 F.3d at 1314 (holding that the defendant was aware of a grave risk of death when he knew that his colleague had a violent and explosive temper, a history of violence, and that he recklessly handled guns, yet proceeded with participating in the robbery knowing his colleague had a gun). And after the shootings, Ross chose to "aid those whom he had placed in the position to kill rather than [aid] their victims." *Tison*, 481 U.S. at 152. The state courts could

reasonably have found that Ross demonstrated reckless disregard to human life.

## V.

We next address Ross's claim that his counsel provided ineffective assistance in the penalty phase, primarily by failing to investigate and present readily available mitigating evidence. To understand what that evidence was and whether it was then available, the California Supreme Court referred the matter to a Referee.

## A.

The Referee found that fifteen witnesses were available to testify at the time of Ross's trial. They would have testified to Ross's childhood and family circumstances but they were never called to testify. These witnesses included Ross's mother, Gloria Brown, along with Ross's siblings and step-siblings, and several other family members with personal knowledge of mitigating evidence.

The Referee found that all of the evidence recounted below was readily available to the defense and was not presented at trial. *In re Ross*, 10 Cal. 4th at 195.

### 1.

### a. Violence Inflicted on Mother by Ross's father, Stafford

Ross's mother, Gloria Brown, testified that during her short marriage to Ross's biological father Stafford, Stafford beat and stabbed her on multiple occasions. When she was eight months pregnant with Ross, Stafford pushed her against a wall and she fell, causing Ross to be born prematurely the next morning. When Ross was an infant,

Gloria left Stafford, but he insisted that she take him back. When she refused, he stabbed her multiple times, puncturing her lung, and she was saved only because her police detective brother was able to fend Stafford off until additional officers arrived.

### b. Abuse by Stepfather Henry Brown

After Stafford went to prison for the stabbing, Gloria lived alone with Ross and her five other children. She had difficulty making ends meet. In 1963, when Ross was about four years old, the family began living with Henry Brown, Gloria's future husband. In 1966 or 1967, Brown's three sons began living with them as well.

Brown would drink often, and "when he drank, he would become violent." He was especially violent after gambling losses at the horse track. He physically and verbally abused Gloria, cutting her many times. He once chased her around the kitchen, causing her to be burned by flaming grease from a skillet. On another occasion, Brown hoisted a television set to throw at Gloria, but Gloria's sister, "grabbed a knife out of the kitchen drawer and threatened him, so he would put [the television set] down." Several times, Brown threatened to kill Gloria, and Gloria's police detective brother had to come to disarm Brown. After these types of incidents, Brown would apologize to Gloria and buy her flowers.

Ross and the other children witnessed this abuse and were also abused themselves. Brown severely "whooped the kids," especially Ross, possibly because Ross "would become very emotional . . . by seeing his mother being beat up." Holding the children upside down, Brown would whip them all over their bodies with "a big wide thick belt," and with large switches off the backyard peach tree. As a result,

the children, including Ross, suffered welts, bruises, and cuts.

Brown also abused the children in other ways. He forced them to kneel in the garage and stare at the wall for long periods of time ranging from "a couple of hours" to "sometimes half a day." He refused to allow Ross to meet his biological father, Stafford Ross. One day, Brown locked Ross's younger sister out of the house, and when she attempted to enter through the window, he "came at [her] with [a] butcher knife." After this incident, the sister, who was a high school freshman at the time, moved out of the house. Ross's older sister also had moved out earlier when she was fourteen years old due to "the violence that happened in the house." The children's nicknames for Brown were "monster," "ski ball head motherfucker," and "the devil."

Around late 1970, when Ross was twelve years old, Gloria went to an attorney and had Brown removed from the home. After they were separated, Brown refused to allow his sons to spend time with Gloria's sons, but they still managed to do so in secret. In 1978, while Ross was in prison for the Howard shooting, Brown apparently "changed," and Gloria reunited with him. Gloria and Brown were living together again at the time of Ross's trial.

### c. Neighborhood Violence

Ross grew up in a "pretty rough" neighborhood. There were "a lot of gangs" and the children "couldn't play out in the streets . . . because [they] would get attacked by the gang people." Around the time of Gloria and Brown's separation, Ross at age twelve began associating with the gang members on the street.

### d.  Ross's Good Character

Ross's family members also testified to his good character.  When Ross was between the ages of about six and fourteen, he visited his grandparents' "large acreage" each summer.  On these trips, Ross was very respectful and did all the chores he was asked to do.

Ross showed great affection for his siblings and cousins. He babysat them, watched over them at the local park, helped teach them how to draw and write, and "always entertain[ed] them."  He walked his sisters to school and protected them from bullies.  His younger sister recalled: "If Henry [Brown] would only allow us to have one sandwich, [Ross] would give me his sandwich. . . . One particular incident . . . [Ross] stood in front of me and told [Brown] don't whoop me, that he'll take my whooping for me."  And according to his aunt, Ross "was like a protector of the children."

Moreover, Ross's stepbrother and brother both testified that Ross helped them turn around their lives.  Specifically, when Ross was twenty-one years old, after the stepbrother's young daughter drowned in 1980, he went "on an alcohol binge," but Ross "worked with [him] very hard and told [him] that it wasn't going to bring [his] baby back, and he would stick with [him] and made sure [he] didn't go back [to] drinking again."  Similarly, around 1977, Ross's brother "was into smoking a lot of weed," but Ross "didn't like that" and talked to him and introduced him to bodybuilding.  As a result, Stafford Ross, Jr. "got it together" and went on to win third place in a "Mr.  Los Angeles" bodybuilding competition.

When asked if, in spite of Ross's crimes, he would have testified at Ross's penalty phase that Ross was a person of

good character, Ross's police detective uncle answered: "[K]nowing the way that he was abused, misused, hurt, knowing what he has seen his mother go through, knowing that the only people that he had contact with were the people out on the streets, who were gang-members, yes, I would have said yes."

### e. School and Institutional History

Gloria and one of Ross's sisters testified about a race-fueled incident at Ross's public school. When Ross was in the fifth or sixth grade, one of his teachers called him the N-word. Ross was "really upset" and told his mother that "he hated to go to the class" and "didn't want to go [back]." Gloria "went to the school to talk to the teacher, and the teacher denied it." Gloria believed Ross, but she did not "press the issue further."

In 1970 and 1971, when Ross was twelve and thirteen respectively, Ross received "an honor award for outstanding achievement in safety" and "a first place award for the shotput." Before Gloria and Brown's separation, Ross's grades were passing, if "not particularly exemplary," but afterward he began getting even lower grades. One of Ross's aunts also testified that Ross began getting into trouble after Gloria and Brown's separation.

By stipulation, the Referee admitted into evidence Gloria's statements to Ross's juvenile probation officers. According to a 1973 probation report: "[Gloria] stated that she feels other boys influenced [Ross] negatively. He is very cooperative at home. [Gloria] asserted that [Ross] needs male guidance and hopes that he can have a male probation officer with much supervision. [Ross] has a poor relationship with the [separated] stepfather."

According to a 1974 report: "[Gloria] state[d] that she would like to try [Ross] home again. 'I feel [the California Youth Authority] would make him only bitter. I don't think there is anything wrong with him psychologically. He is always warm with his family. . . . I never had any problem with [him] until after Mr. Brown and I separated. There was no male supervision. . . ." In that report, Gloria also stated: "[Ross] takes his punishment. He does feel remorse, although he doesn't show it. He would write letters to us stating that he's done wrong and had to pay for his mistakes. He wrote 'It's time I become a better person' and said he would pray for himself."

In a 1975 report, however, Gloria's view had changed: "I am completely unable to control or understand [Ross]. I have done all I can for him, and out of my six children, he is by far the worst." Moreover, she stated that Ross "has a hate for whites, shows a great deal of resentment towards all types of people," and she did not want him released from juvenile custody.

Finally, one of Ross's sisters testified to his difficulties following his release from prison in 1980. Ross "went to the Urban League with [her] and he wanted a job," but "he didn't know what he was doing with the [applications]." Ross could write poetry, but he lacked "the technical skills . . . to get him in a training program" or understand the "jargon" on the applications.

### f. Availability of Witnesses

Ross's family members who testified at the reference hearing stated that they would have testified at his penalty phase and asked the jury to spare his life, but they were never interviewed by the defense. While attending portions of Ross's trial, Gloria "briefly" had conversations with Harris

and "one brief conversation with [Lenoir] in the hallway" during which he told her that Ross "should take a plea bargain." "[N]obody approached [her] about testifying."

Additionally, two of Ross's aunts and two of his sisters testified that they came to court, but when they attempted to speak to Lenoir or Harris, they were either rudely ignored or "brushed" or "shunned" away. Another aunt testified that, at Gloria's direction, she came to court one day because "the attorney wanted her to have some character witnesses for [Ross]." As potential witnesses, she and Gloria were excluded from the courtroom for portions of the proceedings that day. When the day ended without them testifying, counsel said, "We'll call you," but she "never heard anything else from them."

Ross's post-conviction investigator testified that he called Gloria in 1986 and arranged a meeting. At the meeting about two weeks later, Gloria gathered approximately fifteen family members, and the investigator spent eleven or twelve hours interviewing them in one day.

2.

Ross also called the members of his trial defense team as witnesses at the reference hearing. By that time, Lenoir had retired and was in poor physical health. He could no longer remember "the specifics" of the case but he could remember there were "no financial impediments" to investigating. Additionally, it appears that, after Ross's trial, Lenoir directed defense investigator Charles Watson and co-counsel Harris to hand over their trial files to him. Subsequently, "appellate counsel repeatedly requested access to the files over a two-year period and during that period received no replies. Only when the files were subpoenaed to a court hearing did [Lenoir] assert that they

had been lost." At the reference hearing, Lenoir testified that he lost the files when he moved offices.

In an earlier deposition, Lenoir stated that he talked to Gloria "many times" about the case, and that Ross told him that he did not want his mother called as a witness. Champion's counsel also recalled Lenoir stating that "he would have liked to call [Ross's] family members" as witnesses, but that Ross either did not want him to call his family members or did not want him to call his mother specifically.

Investigator Watson "vaguely recall[ed]" that, in preparation for the penalty phase, he interviewed and subpoenaed two of Ross's friends. At Lenoir's direction, Watson also telephoned Gloria and asked her and another family member to appear in court on one specific day during the penalty phase.

Lenoir placed Harris in charge of preparing for the penalty phase of the trial. Harris testified she prepared for the penalty phase by speaking with Ross, Gloria, and several other members of Ross's family, including Brown. These conversations were likely conducted either over the telephone or in the courthouse hallway. Harris's impression from these conversations was that "Ross came from a very stable supportive middle-class type family environment," and she told Lenoir that she thought some of the family members would make good witnesses.

Harris also testified that "the final decision was that Mr. Lenoir simply told me that we weren't going to put on any evidence." She and Lenoir never discussed the possibility that the prosecution might present rebuttal evidence if the defense presented the testimony of Ross's family members. Harris neither obtained Ross's

institutional records nor went or sent an investigator to Ross's house to conduct interviews. Additionally, Ross never told her "not to put any witnesses on to testify in his behalf." Harris testified that, in hindsight, she had lacked the skills to "go deep enough" and "pick up on the[ ] clues" that Ross may have been abused, such as Ross's "very emphatic" statement to her that Brown was not his father, or Gloria's "reluctance in talking about the family situation." Harris concluded: "I absolutely feel I did not do a competent job at the penalty phase, . . . and I'm not happy to say that, but that's true."

According to Lenoir's billing records, Lenoir spent a total of 114.5 hours preparing for the guilt and penalty phases in this case. Robert Bryan, an experienced capital defense attorney, testified that "looking at this billing by itself . . . certainly raises . . . questions" about Lenoir's "performance." Bryan also testified that "child abuse evidence . . . can often make a substantial difference" in a penalty phase, and that it is "very common" for a capital defendant to ask counsel not to present a mitigation case or call particular witnesses. In Bryan's opinion, competent counsel in 1982 would have conducted interviews of family members, retained a mental health expert to investigate issues such as child abuse, and obtained available institutional records.

3.

At the reference hearing, the State presented evidence that it would have sought to introduce in rebuttal if Ross had offered the additional mitigation evidence. This included evidence of Ross's juvenile adjudications for three counts of burglary involving the theft of guns, four counts of robbery, and one adjudication for brandishing a "barbeque fork" at a cook while at a probation camp. These juvenile

adjudications were excluded from evidence during the penalty phase of Ross's trial, but the Referee found that "the trial court would have permitted the prosecutor to introduce [evidence of these adjudications] on rebuttal." *In re Ross*, 10 Cal. 4th at 199.

In addition, the State presented Ross's own statements to his probation officer in 1978 that he had no remorse about the Howard shooting, felt that he had acted in self-defense, and was not concerned about going to prison. The State also relied on Ross's statements in a psychiatric report "prepared for Los Angeles County Juvenile Court proceedings in 1974, when [Ross] was 15." *Id*. There, Ross stated that "he had never been beaten or physically abused by anyone, that he liked his stepfather, Brown, and had gotten along well with him, and that he felt better when there was a man at home fulfilling the role of father. [Ross], who had been held at a camp, said that he wanted to go home." *Id*. at 199–200. Psychiatrist Michael Coburn, however, testified at the reference hearing that adolescents "frequently deny that they have been abused."

The State also presented evidence of four instances of misconduct by Ross while at Deuel Vocation Institution in 1978 and 1979, but the Referee "found that the prosecution probably could not have presented [this] evidence" at the penalty phase because the witnesses had no memory of the events. *Id*. at 199–200, 207. The California Supreme Court "accept[ed] this finding." *In re Ross*, 10 Cal. 4th at 207.

4.

Following the hearing, the Referee filed an eleven-page report containing his factual findings in response to the six questions that the California Supreme Court had referred to him. The Referee first found that Ross's fifteen family

members who testified at the hearing "were sincere," that their testimony "inspire[d] confidence, trust, sympathy, and belief," and that "they were amicable, willing, and anxious to testify now and would have been so in 1982." After summarizing these witnesses' testimonies with varying levels of accuracy, the Referee concluded that the penalty phase jury would have deemed the evidence of abuse suffered by Ross "believable" and "significant," "could [have] easily believed" the evidence of Ross's good character, and could have "infer[red]" and found "instructive" that Ross "was negatively and severely affected by the family breakup and enforced isolation from his stepbrothers."

Next, the Referee found that the "customary and indeed mandatory" steps of interviewing family members, obtaining relevant records, and employing mental health experts "would have led to all of the evidence adduced at the reference hearing." The Referee concluded that, "sad to say, nothing, absolutely nothing of a competent nature was done by way of penalty phase preparation by defense counsel in this case." There were no tactical or financial reasons for the "virtually non-existent" penalty phase preparation, including "no investigation regarding rebuttal." Further, "[a]lthough [Ross] indicated some concerns about his mother's health and her being called as a witness," the Referee found "no substantial evidence to support any reasonable conclusion that [Ross] requested curtailment of the presentation of penalty phase evidence."

With regard to potential rebuttal evidence, the Referee found that the prosecution would have presented Ross's juvenile record and conducted "extensive cross-examination of [Ross's] witnesses." Nevertheless, based on the evidence adduced during the reference hearing, the Referee opined

that "such [rebuttal] evidence would have been outweighed by [Ross's] mitigating evidence and that it is reasonably probable that a more favorable determination would have resulted in the absence of defense counsel's failings."

## B.

To establish deficient performance by counsel, Ross must demonstrate that counsel's representation "fell below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 688. The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotations omitted). This means "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690.

However, "counsel has a duty to present and explain all available mitigating evidence, absent a tactical reason for not doing so." *Demetrulias v. Davis*, 14 F.4th 898, 913 (9th Cir. 2021). After all, "fail[ing] to present important mitigating evidence in the penalty phase—if there is no risk in doing so—can be as devastating as a failure to present proof of innocence in the guilt phase." *Hamilton v. Ayers*, 583 F.3d 1100, 1113–14 (9th Cir 2009) (quoting *Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir. 1992) (per curiam)). To uncover mitigating evidence, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S.

at 691; *see also Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (explaining that in analyzing deficient performance, instead of focusing on whether counsel should have presented a mitigation case, the court should instead analyze "whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable*"). Satisfying this duty requires counsel "to conduct a thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396 (2000).

According to the Referee's findings, however, counsel failed to fulfill that obligation, and thus performed deficiently. The California Supreme Court accepted for purposes of discussion the Referee's finding that defense counsel's "performance was indeed deficient." *In re Ross*, 10 Cal. 4th at 201, 204. However, the California Supreme Court also stated that it "need not decide whether counsel's performance was truly deficient" and focused its analysis solely on *Strickland*'s prejudice prong. *Id.* at 204. Because the issue of deficient performance was left unadjudicated by the California Supreme Court, we review this issue de novo. *Porter v. McCollum*, 558 U.S. 30, 39 (2009); *see also Avena*, 932 F.3d at 1248. Nonetheless, to the extent the California Supreme Court accepted the Referee's findings of fact, we afford them a presumption of correctness under AEDPA. *See* 28 U.S.C. § 2254(e)(1) (providing that "a determination of a factual issue made by a State court shall be presumed to be correct."); *Avila v. Galaza*, 297 F.3d 911, 921 (9th Cir. 2002) (noting that "AEDPA requires us to presume that the referee's factual findings are correct" when they have been adopted by the state court).

The Referee found that the "customary and indeed mandatory" steps of interviewing family members, obtaining relevant records, and employing mental health

experts "would have led to all of the evidence adduced at the reference hearing[ ]." According to the Referee, Lenoir "had delegated responsibility for the preparation of the penalty phase" to Harris, and "the only penalty phase preparation performed by her were 2 or 3 perfunctory conversations in or about the court hallway with family members." Further, the Referee found that there were no tactical or financial justifications for the "virtually non-existent" penalty phase preparation, there was "no investigation regarding rebuttal," and there was "no substantial evidence to support any reasonable conclusion that [Ross] requested curtailment of the presentation of penalty phase evidence." The California Supreme Court did not reject any of these findings.

Based upon the Referee's findings, trial counsel could have investigated and presented the mitigation evidence presented at the reference hearing, but they did not do so. The California Supreme Court acknowledged that this evidence was "substantial" enough that, "[i]f it stood alone," it "may well have . . . established prejudice." *In re Ross*, 10 Cal. 4th at 205.

On federal habeas review, the district court, reviewing de novo, held there is "no reason to reject the referee's finding" of deficient performance. *Ross v. Davis*, No. CV 96-2720 SVW, 2017 WL 2374101, at *15 (C.D. Cal. Apr. 26, 2017). The district court explained that after the guilt phase, "the jurors knew little more about [Ross] than that they had found him guilty on three counts of first degree murder, five counts of robbery, two counts of burglary, one count of rape, and that he was a member of a gang." *Id*. "At the end of the penalty phase, the only additional evidence the jury had was that petitioner had a prior violent felony conviction, resulting from his altercation with Mark Howard, and that Evan Malett had received a life sentence

for his role in the Taylor murder." *Id*. The district court emphasized that the standard penalty phase jury instruction at the time of Ross's trial "essentially required the jury to impose the death penalty if the evidence submitted showed only aggravating circumstances." *Id.*, at \*16. The district court reasoned that "counsel's failure to present a penalty [phase] defense gave the jury little choice but to return a verdict of death." *Id*. This failure was "a gross deviation from what competent counsel would have done." *Id*. The district court concluded, "[t]here is no adversarial process when, in the face of three capital convictions, and multiple accompanying felonies, defense counsel neither thoroughly investigates nor puts forth mitigating evidence of any substance." *Id*.

Like the district court, we have little difficulty concluding that defense counsel's performance was deficient during the penalty phase. The reference hearing illuminated a wealth of potential mitigating evidence that could easily have been discovered by Ross's counsel. Indeed, it took the investigator retained by habeas counsel just fifteen to sixteen hours over less than two weeks to interview all fifteen potential witnesses. *In re Ross*, 10 Cal. 4th at 196. Neither Lenoir nor Harris spent time obtaining records, employing mental health professionals, or looking into Ross's background in any meaningful way to uncover mitigating evidence—steps that competent capital counsel should have taken. *Id*. While counsel spoke briefly to a few family members, there was little (if any) follow up and none of the mitigating evidence was presented. *Id*. There is no suggestion in this record that counsel was aware of the potential mitigating evidence and made a tactical decision against presenting it. *Cf. Dunn v. Reeves*, 141 S. Ct. 2405, 2412 (2021) (refusing to find deficient performance where the record indicated counsel was aware of the defendant's

mental health records and evaluations but ultimately decided not to hire a mental health expert because "counsel's choice regarding experts involved a strategic decision entitled to a presumption of reasonableness."). Here, where counsel "simply did not *know*" the mitigating evidence, this utter failure to investigate meant that "they could not have intelligently chosen one strategy over another." *Andrews*, 944 F.3d at 1112.

## C.

To establish prejudice, Ross must demonstrate that there is a "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. When examining the penalty phase of a capital case, the standard requires "a reasonable probability that at least one juror" would have recommended a sentence of life instead of death. *Wiggins*, 539 U.S. at 537. This probability must be "substantial, not just conceivable." *Richter*, 562 U.S. at 112; *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020).

The California Supreme Court rejected the Referee's finding of prejudice. *In re Ross*, 10 Cal. 4th at 205. The state court noted that it deliberately did not ask the Referee to make a finding on the ultimate question of whether Ross was prejudiced by counsel's performance, because that question is a mixed question of law and fact. *Id*. To properly analyze the prejudice prong requires a reweighing of the evidence introduced and the mitigating evidence available. *Mayfield v. Woodford*, 270 F.3d 915, 928 (9th Cir. 2001). Here, the "record of the reference hearing indicate[d] the referee did not review the trial record." *In re Ross*, 10 Cal. 4th at 205. The Referee therefore could not have properly

assessed prejudice by "compar[ing] the actual trial with the hypothetical trial that would have taken place had counsel [performed] competently." *Id*.

Instead, the California Supreme Court concluded that it was not reasonably probable that the outcome of Ross's penalty phase trial would have been different had counsel presented the mitigating evidence. *Id*. Although "substantial," the mitigating evidence was somewhat weaker than the Referee had found. As the California Supreme Court described it, the "mitigating evidence consisted of the testimony of 15 members of petitioner's family testifying primarily that they loved petitioner, that he was protective and caring to other family members, and that he was abused as a child . . . , that petitioner lived in a violent neighborhood, that his failure to be rehabilitated was partly the fault of institutional authorities, and that he expressed remorse for earlier crimes." *Id*. However, this mitigating evidence "was subject to substantial impeachment and potentially devastating rebuttal," which "alters the equation." *Id*.

Specifically, the state court recognized several significant areas of impeachment weakening the evidence in mitigation. First, the court found the psychiatric report in which Ross told the psychiatrist that he had never been beaten or abused by anyone and that he liked and got along well with his stepfather, Brown, would have made effective impeachment because it was in Ross's own words and was "more contemporaneous to the alleged incidents than the later testimony of his relatives." *Id*. at 206. Moreover, at the time of trial, Gloria and Brown had reconciled and had begun living together. *Id*. This, too, "would certainly have weakened the impact of the abuse evidence." *Id*. Finally, Gloria's statements to the probation officer that Ross was

cooperative at home, but that when he was with his peers he had no control of himself or his behavior, made "long before the trial, and thus closer in time to the events at issue" would have "undercut the mitigating evidence relating to [Ross's] behavior." *Id*.

When discussing the "potentially devastating rebuttal" evidence, the state court primarily focused on Ross's juvenile criminal history. *Id*. At Ross's trial, "no evidence of misconduct by [Ross] before he was 18 years old" was presented to the jury. *Id*. However, the Referee found, and the California Supreme Court accepted, that Ross's juvenile convictions for robbery and for brandishing a weapon at probation camp would have been permitted as rebuttal evidence. *Id.* at 207. Additionally, the state court recognized that Ross's sustained petitions on juvenile burglary convictions involving theft of guns would have been admissible to rebut the character evidence painting Ross as a "kind, protective, caring person." *Id*. The court reasoned that the potential evidence was "not limited to any singular incident, personality trait, or aspect of his background," so the "breadth and generality of [] good character evidence warranted rebuttal evidence of the scope offered." *Id.* at 208.

The California Supreme Court also recognized how almost all of the mitigation evidence was "painfully limited" to Ross as a young child. *Id*. The state court then "question[ed] how effective it would be for the defense to present a parade of witnesses testifying about [Ross's] good qualities up to sometime around the age of 12 years, but necessarily leaving an obvious gap during his teen years," *id*., when he incurred his series of juvenile convictions and delinquent acts. This, the court found, opened the door to

the rebuttal evidence proffered by the prosecution.  *Id.* at 208–09.

Next, the California Supreme Court evaluated the defense actually presented at trial.  It concluded that "counsel gave the penalty jury a reason to spare [Ross's] life." *Id.* at 209.  It found that "[c]ounsel did not simply give up, but had a specific tactical approach, and presented evidence and argument to support this approach." *Id.* (quotation and citation omitted).  While defense counsel did not present witnesses, Lenoir did "argue[] mitigating inferences from the guilt phase evidence presented by the prosecution" and presented three items of evidence through stipulation and judicial notice." *Id.* at 209–10.  While the court found that this defense was minimal, it still "presented a coherent case, and avoided the impeachment and rebuttal the new mitigating evidence would have elicited." *Id.* at 210.

The state court then walked through all the arguments Ross's defense counsel actually made in his closing argument.  Lenoir stressed the "harshness" of a life sentence without the possibility of parole. *Id*.  He compared the fate of Ross's accomplice in the Taylor murder, who was found to have used a firearm in the crime, but who did not receive a verdict of death. *Id*.  Counsel also argued that the prosecution "concede[d]" it did not prove Ross used a firearm during the murders. *Id*.

Lenoir also introduced evidence that Mark Howard, who Ross had assaulted, was a gang member.  And Lenoir argued that the jury "can reasonably infer that Mr. Ross behaved during the two years he was in prison [for the assault of Mark Howard].  There is nothing to show otherwise." *Id*.  This supported Lenoir's argument that Ross has proven he could conform in a confined environment. *Id*. at 211.  This

argument, "a potentially compelling one" according to the California Supreme Court, "could not have been made if counsel had produced the mitigating evidence suggested in this proceeding and triggered the rebuttal evidence" of Ross's nonconforming behavior while in juvenile detention. *Id.* Lenoir also argued Ross's young age was a mitigating factor and "discussed a mitigating circumstance of the crime, and mitigating facts of the Howard assault, including the victim's gang membership." *Id.* The California Supreme Court found that "[a]ll of these circumstances would have justified a decision not to use the additional evidence presented at the reference hearing even after full investigation, and must be considered in deciding whether it is reasonably probable the result would have been different had the evidence been presented." *Id.*

The state court acknowledged that there was no direct evidence, due to Lenoir's lack of memory, that failing to present mitigating evidence was based on tactical reasons. *Id.* at 213. "But even if we assume[d] counsel *would* have presented the evidence," said the court, "we conclude, after comparing the trial as it actually occurred with the trial as it would have been with the mitigating evidence, that there was no prejudice." *Id.* The court then cogently explained its reasoning:

> Petitioner was convicted of three murders on two separate occasions, including the cold-blooded killing of a father and fourteen-year-old son, who were shot while lying on a bed, one with his hands tied behind his back. He personally raped the sister of the third murder victim. Although the additional mitigating evidence, had it been presented, might have evoked sympathy, there was no compelling

connection between that evidence and the crimes of this case. The crimes were gang-conducted robbery murders, not sudden explosions of angry violence or psychopathic serial killings. Moreover, the mitigating evidence would have elicited damaging impeachment and rebuttal evidence, with an inevitable adverse effect on the actual defense strategy at trial. For all these reasons, we find no reasonable probability the result would have been different had the mitigating evidence been presented.

*Id*. Ross argues that the California Supreme Court's rejection of his ineffective assistance of counsel claim was both contrary to and an unreasonable application of *Strickland*. We address these contentions in turn.

1.

The parties agree that once the reviewing court identifies all the potential mitigating evidence then available to competent counsel to present to the trial court, *Strickland* requires that the court reweigh the "evidence in aggravation against the totality of available mitigating evidence to determine 'whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Apelt v. Ryan*, 878 F.3d 800, 832 (9th Cir. 2017).

Ross relies on our recent *en banc* decision in *Andrews* to suggest that the California Supreme Court improperly weighed the mitigating and aggravating circumstances. He also argues that the similarity of the fact patterns between *Andrews* and his case requires us to conclude that the

California Supreme Court was unreasonable in its prejudice determination. As to Ross's legal argument, our decision in *Andrews* lends no support. In contrast to the California Supreme Court's careful and meticulous reweighing of the evidence in light of the potential mitigating evidence adduced in the reference hearing in *Ross*, the California Supreme Court in *Andrews* failed to separately analyze the prejudice prong. This resulted in two unreasonable applications of *Strickland*'s legal principles.

First, we concluded in *Andrews* that the California Supreme Court committed legal error when it improperly conflated the two *Strickland* prongs. In denying habeas relief, the California Supreme Court held that Andrews's counsel had not performed deficiently and concluded "[f]or the same reasons," it was not probable that Andrews was prejudiced by the failure to present the potential mitigating evidence. *Andrews*, 944 F.3d at 1106. But, as we reasoned in *Andrews*, "*Strickland*'s two prongs serve separate purposes," with the deficiency analysis focused on "counsel's adherence to reasonable professional standards, while prejudice looks to the weight of the available evidence and its effect on the case." *Id*. at 1116 (citing *Strickland*, 466 U.S. at 693–95). In *Ross*, the California Supreme Court did not commit this error. It expressly stated it was not addressing the deficiency prong and instead focused exclusively on prejudice. *In re Ross*, 10 Cal. 4th at 205.

Second, in *Andrews*, "the California Supreme Court hardly engaged in the reweighing of evidence that *Strickland*'s prejudice analysis requires." *Andrews*, 944 F.3d at 1116. Indeed, the entirety of the court's "reweighing" of the evidence can be found in sixty-two words in a single sentence. *Id*. (quoting *In re Andrews*, 28 Cal. 4th 1234, 1259 (2002)). Thus, we concluded even

"giving the California Supreme Court's analysis all the deference it is due along with every benefit of the doubt, only an unreasonable application of *Strickland*'s principles could lead to the conclusion that Andrews was not prejudiced by counsel's deficient representation at the penalty phase." *Id*. at 1117.  The same is not true here.  Rather, the California Supreme Court devoted several pages of its opinion to the prejudice analysis.   The court discussed at length the aggravating and mitigating evidence actually presented at trial by the parties along with all the potential mitigation evidence, and the "inevitable adverse effect" that the additional rebuttal and impeachment evidence would have had.  *In re Ross*, 10 Cal. 4th at 205–13.  Considering that "AEDPA demands that 'state-court decisions be given the benefit of the doubt,'" *Andrews*, 944 F.3d at 1116 (quoting *Pinholster*, 563 U.S. at 181), the thorough analysis by the California Supreme Court here cannot fairly be compared to the brief aside the California Supreme Court gave to its *Strickland* prejudice analysis in *Andrews*.

And as to the facts, although there are some similarities between the crimes for which Andrews and Ross were convicted, *Andrews* involved readily available potential mitigating evidence of such an order of magnitude that the failure to investigate and present that evidence, and the California Supreme Court's denial of habeas relief under *Strickland*, represented "the type of 'extreme malfunction []' in the operation of a state's criminal justice system that justifies the intervention of a federal habeas court." *Andrews*, 944 F.3d at 1099 (quoting *Richter*, 562 U.S. at 102).

Like Ross's crimes, the "facts of Andrews's crimes inspire little sympathy."   *Andrews*, 944 F.3d at 1100. Andrews participated in a drug-related robbery that resulted

in the murders of three persons. He was convicted of the first-degree murder of those persons, rape, sodomy, and robbery, and the jury found four special circumstances to be true, making him eligible for the death penalty. *Id.* The jury sentenced Andrews to death on each of the murder counts. *Id.* at 1101.

As in Ross's case, Andrews's lead defense counsel, who was also Gerald Lenoir, made a limited presentation during the penalty phase. Defense counsel stipulated that Andrews was twenty-nine at the time of the murders and that Andrews had previously pleaded guilty in Alabama to armed robbery, escape, and robbery, stipulations which the prosecutor introduced into evidence. *Id.* Defense counsel submitted sworn affidavits explaining that in connection with Andrews's prior murder conviction, it was his co-defendant who actually used a firearm to kill the victim. *Id.* No witnesses for the defense were called. *Id.*

In both cases, the California Supreme Court affirmed the convictions on direct review. In both cases, on habeas review, the court appointed a Los Angeles Superior Court judge to conduct a reference hearing and to take evidence and answer a series of questions. And this is where the two cases diverge in the nature, extent, and gravity of the readily available mitigating evidence.

The prosecutor in Andrews's case portrayed him as a "vicious animal." *Id.* at 1099. Defense counsel failed to employ the "standard investigative techniques" and "simple persistence" that would have revealed humanizing evidence that could have allowed the jury to understand how it was that Andrews came to commit these violent crimes. *Id.* at 1101. As eloquently described in *Andrews*, as a result of counsel's deficient performance:

The jury . . . did not know—because it was never told—anything about Andrews's upbringing in a segregated and impoverished area of Mobile, Alabama. Andrews's counsel did not tell the jury that Andrews, as a child, had been confined to the Alabama Industrial School for Negro Children known as "Mt. Meigs"—a segregated, state-run institution that, in the words of one witness, was a 'slave camp for children.' The jury was not told that, during these formative years, Andrews was repeatedly subject to brutal abuse at the hands of his state custodians. It was not told that, from the age of fourteen, Andrews was in the custody of Alabama state institutions so degrading that federal courts later found the conditions in those institutions violated the Eighth Amendment's prohibition on cruel and unusual punishment. Nor was the jury told that, in the view of mental health experts, the severe abuse Andrews suffered made his subsequent criminal behavior understandable and predictable.

*Id*. at 1099.

The mitigating evidence withheld during the penalty phase in Andrews's case cannot be understated. A witness testified, "the children committed to Mt. Meigs in the 1960s had 'no chance of rehabilitation' and 'came out much worse' than when they entered. Indeed, the institution was 'not designed for rehabilitation.'" *Id.* at 1102. Children instead "pick[ed] cotton and tend[ed] vegetables." *Id.* And if that weren't enough, "[a]t night, there was little supervision, leading to 'a lot of sexual abuse of children.'" *Id.* Thirteen

witnesses who had been committed to Mt. Meigs detailed its abhorrent conditions. One witness recalled a truly disturbing disciplinary trend:

> When a child was disobedient in the fields or failed to pick his quota of cotton, an overseer would "poke a hole in the ground and order him to lie down, to pull down his pants, and to stick his penis into the hole. The overseer would then beat the boy's thighs with a stick, often until the skin burst open. One witness remembered seeing [Andrews] beaten in this manner."

*Id*. It was reported that, because of Andrews's "young age and slight build," he was often the target of "substantial sexual pressure," particularly from "older, tougher boys, from whom no protection or separation was provided." *Id.* at 1103. This physical and sexual abuse continued after Andrews's incarceration "[j]ust months after his release from Mt. Meigs": Andrews's "counsel presented evidence at the state court hearing that Andrews was 'repeatedly raped in prison.'" *Id.* And a former inmate described Andrews as a "little sheep among wolves, a baby among a bunch of grownups." *Id.* Like Mt. Meigs, the prison in which Andrews was detained had debilitating conditions, and because it was newly integrated, "many of the [w]hite prison guards resented the [b]lack prisoners, whom they called 'things' and 'niggers.'" *Id.*

Andrews's defense counsel's closing argument was extremely limited. Defense counsel "gave a short, rambling closing statement" that "overwhelmingly focused on Andrews's age," and argued that Andrews's age alone "can be sufficient mitigation." *Andrews*, 944 F.3d at 1101.

Defense counsel "veered from topic to topic," ineffectively arguing that Andrews didn't pull the trigger in his prior murder conviction, and that his current co-defendant received a life sentence. *Id*.

Our *en banc* court held that "it is unconscionable and unreasonable to uphold a sentence of death when the jury never heard readily available mitigating evidence of the magnitude present here." *Id*. We upheld the district court's grant of habeas relief on Andrews's claim of ineffective assistance of counsel at the penalty phase. *Id*.

By contrast, here, it was not unreasonable for the California Supreme Court to conclude that the potential mitigation evidence—which is limited to Ross as a young child—was likely insufficient to give the jury a basis to understand why Ross would engage in such heinous crimes as an adult. Arguably, it might have swayed one juror to vote for life upon hearing fifteen relatives ask for mercy, but it was not unreasonable for the California Supreme Court to have concluded otherwise. We therefore do not believe *Andrews* controls the outcome of this case.

It also bears mentioning that defense counsel's closing argument on behalf of Ross was more detailed than on behalf of Andrews, particularly with respect to mitigating inferences. As the California Supreme Court reasonably concluded in *Ross*, defense counsel "gave the penalty jury a reason to spare his life." *In re Ross*, 10 Cal. 4th at 209. He "argued mitigating inferences from the guilt phase evidence presented by the prosecution," and also that Ross was only twenty-one at the time of the murders, that Mark Howard was a gang member, that it was Evan Malett who pulled the trigger in the Taylor murders, and that Ross had proven he can behave in a confined environment like prison. *Id*. at 209–10.

Ross contends that the California Supreme Court's consideration of defense counsel's closing argument while reweighing the evidence was contrary to *Strickland* because it is axiomatic that "argument is not evidence." But this is not quite what the California Supreme Court actually did— it did not consider counsel's argument in a vacuum. Rather, the state court considered counsel's argument to the extent he argued inferences legitimately drawn from the evidence. Lenoir "argued mitigating inferences from the guilt phase evidence presented by the prosecution" as well as mitigating inferences from the three items of evidence introduced by stipulation and judicial notice—Malett's life sentence, Howards' gang membership, and Ross's relative youth and conformity during confinement. *In re Ross*, 10 Cal. 4th at 209–10. Although argument is not evidence, it must be based on inferences properly drawn from the evidence. And drawing out those inferences in a way favorable to Ross was counsel's duty. Here, unlike in *Andrews*, the California Supreme Court reweighed the evidence, including the reasonable inferences rationally drawn from it, as required by *Strickland*.

For example, defense counsel argued, "You can reasonably infer that Mr. Ross behaved during the two years he was in prison [for the assault on Mark Howard]. *There is nothing to show otherwise.*" *Id.* at 210 (emphasis added). And he pointed out that the diligent prosecutor would have presented evidence to the contrary had it existed. From that, defense counsel drew the inference he believed the jury should make: "Some people cannot conform unless they are in a confined environment, and he has proven that he can do that." *Id.* at 211. The California Supreme Court weighed that evidence and those inferences against the hypothetical trial where the potential mitigation evidence had been introduced: "This argument, a potentially compelling one

when the jury must decide whether the defendant should spend the rest of his natural life in a 'confined environment,' could not have been made if counsel had produced the mitigating evidence suggested in this proceeding and triggered the rebuttal evidence that petitioner had a sustained juvenile petition 'for brandishing a weapon based on threatening a probation camp cook with a large serving fork.'" *Id*.

Moreover, Ross cites no well-established Supreme Court precedent precluding consideration of closing argument when a reviewing court conducts the *Strickland* prejudice analysis. To the contrary, both the Supreme Court and our court have addressed defense counsel's closing argument when conducting a *Strickland* prejudice analysis. *See, e.g., Williams*, 529 U.S. at 369 (noting that the bulk of defense counsel's closing argument "was devoted to explaining that it was difficult to find a reason why the jury should spare [defendant's] life" and ultimately concluding habeas relief was warranted); *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003) (explaining how "tactical decisions in [counsel's] closing presentation [are] particularly important because of the broad range of legitimate defense strategy at that stage" in denying habeas relief); *Bell*, 535 U.S. at 701 (rejecting the argument that waiving closing argument and "counsel's failure to advocate for life in closing necessarily left the jury with the impression that he deserved to die" in denying habeas relief); *Andrews*, 944 F.3d at 1101 (highlighting counsel's "short, rambling closing statement" as part of the minimal mitigation case that warranted granting federal habeas relief); *Avena*, 932 F.3d at 1251 (discussing a defense closing argument that congratulated the jury on reaching the right decision in convicting their client).

Ross next argues for the first time on appeal[7] that the California Supreme Court acted contrary to *Strickland* because it improperly applied a causal nexus test between the potential mitigation evidence and the home-invasion robbery murders. *See In re Ross*, 10 Cal. 4th at 212–13. After reviewing the strong aggravating factors in this case—the three cold-blooded murders, including that of a man and his fourteen-year-old disabled son, hands tied behind one of their backs, and the rape of the sister of the third murder victim—the California Supreme Court did note "[a]lthough the additional mitigating evidence, had it been presented, might have evoked sympathy, there was no compelling connection between that evidence and the crimes of this case." *In re Ross*, 10 Cal. 4th at 213. It explained that "[t]he crimes were gang-conducted robbery murders not sudden explosions of angry violence or psychopathic killings." *Id*.

In *Eddings v. Oklahoma*, 455 U.S. 104 (1982), the Supreme Court held that it was an Eighth Amendment violation to preclude the sentencing entity from considering mitigation evidence because it was not mitigating as a matter of law. There, the trial judge stated that, in "following the law," he could not "consider the fact of this young man's violent background," meaning the mitigating evidence of Eddings's violent physical abuse by his father. *Eddings*,

---

[7] Although we generally do not consider an issue raised for the first time on appeal, we may address this issue when either (1) "review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process," (2) "a new issue arises while appeal is pending because of a change in the law," or (3) "the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *Bolker v. C.I.R.*, 760 F.2d 1039, 1042 (9th Cir. 1985) (citations omitted). We elect to consider the issue here to preserve the integrity of the judicial process and because the record is fully developed for our consideration.

455 U.S. at 109. But, once again, this is not quite what the California Supreme Court did here. It did not refuse to consider the physical abuse of Ross by his stepfather Brown; it did consider it and concluded Ross's abuse did evoke sympathy. *In re Ross*, 10 Cal. 4th at 195. However, the state court noted that all of the abuse had ended when Brown left the family when Ross was age twelve. *Id.* at 208. And in stating that there was "no compelling connection between that evidence" and these crimes, the court was merely stating that the early childhood abuse Ross had suffered had failed to sufficiently explain why Ross had committed the heinous crimes of which the jury had just found him guilty, especially in light of the potential rebuttal that Ross has an extensive record consisting of gun-related juvenile offenses.

For example, in *Avena v. Chappell*, we found that potential mitigating evidence that defense counsel failed to present prejudiced the defendant precisely because it explained to the jury why the brutal crimes were committed. For Avena, evidence of "habitual PCP use, as well as the effects the drug had on his demeanor" provided "considerable potential . . . to argue . . . [its] use contributed to [Avena's] violent and erratic behavior on the night of the carjacking homicides." *Avena*, 932 F.3d at 1252. Here, the potential mitigating evidence of abuse, while indisputably significant, sheds no light on why Ross would have committed the three cold-blooded murders and rapes, or why the jury should not impose the death penalty given the heinous nature of the crimes. *See In re Ross*, 10 Cal. 4th at 212–13. We conclude that the California Supreme Court's decision was not contrary to *Strickland*.

2.

The California Supreme Court's decision denying Ross's claim of ineffective assistance of counsel during the

penalty phase for lack of prejudice was a reasonable application of *Strickland*.  28 U.S.C. § 2254(d)(1).

To begin, we defer to the California Supreme Court's finding that the additional mitigation evidence uncovered at the reference hearing was "substantial."  *Id.* at 205.  While growing up, Ross was abused extensively by his stepfather, and "[e]vidence of abuse inflicted as a child is especially mitigating."  *Andrews*, 944 F.3d at 1117; *see also Summerlin v. Schiro*, 427 F.3d 623, 635 (9th Cir. 2015) (en banc) (referring to family history and abuse as "classic mitigation evidence").  All fifteen available witnesses would have asked the jury for a life sentence instead of death, a plea for mercy that the jury should have heard.  *See Livaditis v. Davis*, 933 F.3d 1036, 1048 (9th Cir. 2019).

The California Supreme Court properly reweighed the old and new mitigating evidence against the existing aggravating evidence.  "Courts considering additional evidence in post-conviction proceedings must 'evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation.'"  *Mann v. Ryan*, 828 F.3d 1143, 1160 (9th Cir. 2016) (en banc) (quoting *Williams*, 529 U.S. at 397–98).  When the state habeas record includes new factual allegations or evidence that the court reasonably finds subject it to a "potentially devastating rebuttal," *In re Ross*, 10 Cal. 4th at 205, the court may reasonably conclude that the mitigating evidence "is of questionable mitigating value."  *Pinholster*, 563 U.S. at 201.

Here, the California Supreme Court recognized that Ross's potential classic mitigating evidence—physical abuse and good character—did not cover Ross's post-adolescent period following Gloria's separation from Brown

when Ross was twelve.  And while substantial testimony painted Ross as a kind and nurturing person as a child and young adolescent, the California Supreme Court found that there was no evidence of Ross's continuing good character. Indeed, the prosecutor introduced evidence that by the time Ross turned eighteen, he was a gang member who had already shot Mark Howard six times in the chest and torso over a dispute about a radio.  The California Supreme Court questioned just how "effective it would be for the defense to present a parade of witnesses testifying about petitioner's good qualities up to sometime around the age of twelve years, but necessarily leaving an obvious gap during his teen years."  *In re Ross*, 10 Cal. 4th at 208.  Because the California Supreme Court recognized that practically all the mitigating evidence was "painfully limited" to a pre-adolescent Ross, *id.*, the court reasonably concluded the jury would not have been swayed by it against imposing the death penalty in light of the potential rebuttal and impeachment evidence and the heinous circumstances of the murders.

Had the potential mitigating evidence been admitted at trial, potentially damaging impeachment and rebuttal evidence would have been triggered, according to the California Supreme Court.  *See id.* at 205.  This evidence was particularly devastating because it filled the gap from the time Brown stopped beating Ross at age twelve to his gang membership and shooting of Howard at age eighteen. Between the ages of twelve and eighteen, Ross developed an extensive juvenile record: four counts of robbery, three counts of burglary involving the theft of guns, and one count of brandishing a fork in a threatening manner at a cook while in custody.  *Id.* at 207.  The California Supreme Court reasonably determined this evidence was admissible "to rebut evidence portraying [Ross] as a kind, protective, caring person."  *Id.*

Ross argues that this evidence may not have been admitted had counsel solely focused on his family background and the physical abuse he endured at the hands of Brown. But even assuming that defense counsel had found the good character evidence, but decided not to introduce it in mitigation, the California Supreme Court reasonably determined the testimony about the physical abuse itself was impeachable in two ways: by Ross's mother's prior statements and by Ross's own prior statements. *Id.* at 206. The state court reasonably found that the statements Gloria made to Ross's probation officers highlighting how Ross's problems only started after she separated from Brown and how Ross was "by far the worst" out of her six children and "show[ed] a great deal of resentment towards all types of people," statements made closer in time to his juvenile crimes, would have undermined her trial testimony. And the facts that at the time of trial Gloria had reunited with Brown and that they were living together would surely have been elicited to question the fact and extent of any abuse Ross suffered. Ross's own statements to a psychiatrist at the age of fifteen that he liked his stepfather Brown and was not abused at home further undermined the testimony about the abuse. *Id.* at 200. Because this statement was closer in time to the alleged abuse, the court reasonably determined it carried more weight than the potential mitigation testimony would have carried. *Id.* Considering that these statements and actions are logically inconsistent with the claimed abuse, the California Supreme Court reasonably concluded that the mitigating evidence of abuse would have been weakened in reweighing the mitigating evidence.[8]

---

[8] As the California Supreme Court itself noted, Ross could have countered this impeachment evidence with argument about how victim

The California Supreme Court also found Ross's argument that his defense counsel could "parse" the character evidence into discrete periods failed as a matter of law. It explained that the purpose of rebuttal at this stage was to present a "balanced picture of the defendant's personality." *Id.* at 208. The court elaborated: "Evidence that petitioner was a good child, but committed various acts of misconduct as a teenager and then as an adult, presents a more balanced picture than evidence that petitioner was a good child, then later committed adult crimes, deleting accurate evidence of petitioner's juvenile record." *Id.* at 208–09. It reasonably concluded, "[c]haracter evidence cannot be parsed so finely." *Id*. at 209.

The circumstances of the murders, as well as the murders themselves, were aggravating factors. Ross "was convicted of three murders on two separate occasions, including the cold-blooded killing of a father and his fourteen-year-old [disabled] son, who were shot while lying on a bed, [the father] with his hands tied behind his back." *Id*. at 213. Ross personally twice raped the sister of the third murder victim, Michael Taylor. *Id*. The state court judges used words such as "sadistic, unbelievably cruel, senseless," and "cold-blooded" to describe the murders. *In re Ross*, 10 Cal. 4th at 213. Indeed, these facts "inspire little sympathy." *Andrews*, 944 F.3d at 1100; *see also Cain v. Chappell*, 870 F.3d 1003, 1021 (9th Cir. 2017) ("[I]n light of the aggravating circumstances involving the brutal murders of a couple in

---

denial and inconsistent forms of behavior are common in abusive situations. *See In re Ross*, 10 Cal. 4th at 206. The court nevertheless reasoned that "petitioner's own words, more contemporaneous to the alleged incidents than the later testimony of his relatives, would have made effective impeachment." *Id*. Under AEDPA, we must defer to this finding.

their sixties, the thirteen blows administered to [the husband], the attempted rape of [the wife], and Cain's prior violent acts, the state court's denial of this claim was not unreasonable.").

The jury heard further aggravating evidence of Ross's violence. Ross shot Mark Howard six times in the chest in a dispute over a radio, an act the prosecutor described as essentially "a[nother] murder where the victim, fortunately, did not die." Based on the extent of the aggravating circumstances here, as well as the rebuttal evidence of juvenile crime, the California Supreme Court reasonably concluded that "even if [it assumed that] counsel *would* have presented the [mitigating] evidence, . . . after comparing the trial as it actually occurred with the trial as it would have been with the mitigating evidence, [] there was no prejudice." *In re Ross*, 10 Cal. 4th at 213; *see Shinn*, 141 S. Ct. at 524 (finding that because of the nature of the aggravating circumstances, "[p]erhaps the most probable reason for [the state court's] no-prejudice determination is simply that the new mitigation evidence . . . did not create a substantial likelihood of a different sentencing outcome."); *see also Livaditis*, 933 F.3d at 1050–51 (9th Cir. 2019) (finding the strength of aggravating evidence a factor in favor of denying the *Strickland* claim under AEDPA review).

Ross disputes that the nature of the murders was so aggravating that the potential mitigation evidence could not have shifted the balance between life and death in the mind of at least one juror. But this argument is based on his rearguing the weight of the evidence as to his presence at the Hassan murders when the jury found that he was present and participated in the murders. Ross also argues that the fact he

was not the triggerman[9] minimizes his role in the murders. Yet the jury had just convicted him of the three heinous murders, robbery, and rape. After carefully considering all of the mitigating and aggravating evidence introduced at trial—including Ross's conduct during the trial, the potential mitigating evidence, and the potential impeachment and rebuttal evidence that could have been introduced—the California Supreme Court concluded that a sentence less than death was not reasonably probable. We cannot say that the California Supreme Court's conclusion was unreasonable under all the circumstances presented here.

## VI.

Certainly we would not find it unreasonable had the California Supreme Court determined Ross was prejudiced by counsel's deficient performance. Even the State agreed that "the [California Supreme Court] certainly could have decided the matter differently." But because the California Supreme Court's conclusion "was premised on logic and reason," it "cannot be fairly called unreasonable," and thus should not be disturbed. On this record, habeas relief cannot be granted.

For the reasons stated herein, we **AFFIRM** the decision of the district court.

---

[9] The record is inconclusive on who actually fired the gun for all three murders, meaning it is entirely possible that Ross was indeed the shooter. However, no evidence established that fact and the prosecution conceded it likely did not prove that Ross was the shooter beyond a reasonable doubt.